**CONSARC CORPORATION,**
Plaintiff–Appellant,

v.

**MARINE MIDLAND BANK, N.A.,**
Defendant–Appellee.

No. 649, Docket 92–7821.

United States Court of Appeals,
Second Circuit.

Argued Dec. 15, 1992.

Decided June 14, 1993.

Michael R. McGee, Buffalo, NY (F. Brendan Burke, Jr., James P. Giambrone, Jr., McGee & Gelman, Buffalo, NY, of counsel), for plaintiff-appellant.

Kenneth Payment, Rochester, NY (A. Paul Britton, Harter, Secrest & Emery, Rochester, NY, of counsel), for defendant-appellee.

Before FEINBERG, CARDAMONE and PRATT, Circuit Judges.

CARDAMONE, Circuit Judge:

Consarc Corporation, a New Jersey corporation with its principal office in Rancocas, New Jersey, sued Marine Midland Bank (Marine or bank), a national bank with its principal office at Buffalo, New York, in the United States District Court for the Western District of New York (Curtin, J.) for an alleged breach of contract. The district court granted summary judgment to Marine finding no binding contract between it and Consarc.

One of the principal issues raised on this appeal is whether such a contract existed between the parties in the absence of a formal writing. Many modern business transactions could not be carried out unless the parties were able to rely on oral promises or informal writings, such as letters, memos and faxes. A stock market transaction or insurance coverage by verbal binder are examples. In other, more complex transactions, negotiations would be chilled were a person later to be held bound by every chance promise made. In such situations, the legal obligation must await the execution of a formal written agreement—so the party may be assured that all proper precautions were taken before it was legally committed.

The tension between the concepts—contract arises upon meeting of the minds, no binding contract absent a writing—has resulted in courts struggling to resolve these inherently conflicting notions. From this judicial effort have evolved two widely-accepted common law principles: (a) that absent an expressed intent that no contract shall exist, mutual assent between the parties, even though oral or informal, to exchange acts or promises is sufficient to create a binding contract; and (b) that to avoid the obligation of a binding contract, at least one of the parties must express an intention not to be bound until a writing is executed. In granting summary relief to the bank the district court did not view the evidence before it with respect to these two rules in a light most favorable to Consarc, the non-moving party, as it was required to do. Hence, we reverse.

## FACTS

Consarc Corporation manufactures advanced high technology steel-making furnaces for steel manufacturers. Guterl Special Steel Corporation, a steel manufacturer, is a Delaware corporation previously headquartered at Lockport, New York, but now a debtor in a Chapter 11 proceeding in the Western District of Pennsylvania. Consarc's relationship with Marine springs from an arrangement under which the bank agreed to loan $7.5 million to Guterl Steel partly to finance its purchase of two steel furnaces from Consarc. In 1981 these two companies contracted for Consarc to supply Guterl with two state-of-the-art furnaces, one a vacuum induction melting type and the other an electroslag remelting furnace. Guterl agreed to pay $9 million for the furnaces and related engineering and construction services in connection with their installation, all as part of an overall modernization of its facility, the total cost of which was $15 million.

Marine was a 50 percent participant with Equimark Commercial Finance of Pittsburgh in supplying an $8 million revolving line of credit to Guterl beginning in 1979. After lengthy negotiations in early 1981, Marine agreed to lend Guterl $7.5 million, part of which was to help finance the modernization project, and part of which was made specifically for the two new Consarc steel-making furnaces. Due to Consarc's financial stake in Guterl's ability to pay for the furnaces, Consarc became concerned when the bank began to equivocate on whether it would actually make the loan to Guterl.

Marine first became anxious with regard to Guterl's ability to repay loans advanced to it for the two steel-making furnaces when it learned that Guterl might not meet its promised payments schedule on another $7.5 mil-

lion loan. Guterl had negotiated the other loan with the Southern Investors Management Company (Southern Investors). The Southern Investors loan was to be guaranteed by the Farmers Home Administration and contained certain conditions Guterl was to meet. If Guterl was unable to meet these financial benchmarks it would lose access to the balance of the Southern Investors loan proceeds. Without Guterl's access to those proceeds, Marine worried that Guterl would not pay for the Consarc-built furnaces and Consarc in turn would be unable to complete manufacturing them. Thus, the bank feared it might be left with no collateral to protect its own $7.5 million loan to Guterl.

Guterl commenced discussions with Consarc and Marine in an attempt to allay Marine's concerns. Representatives of Guterl, Consarc and Marine met on October 7, 1981 in Marine's Buffalo offices. At this meeting the bank finally agreed to advance the loan to Guterl. In return, Consarc promised to complete the furnaces so that Marine could use them as collateral to secure its loan. The parties now dispute exactly what additional promises were made at this October 7 meeting. Consarc asserts Marine promised to pay the entire loan proceeds directly to it. The bank avers that while it agreed to loan Guterl the $7.5 million, it retained the option to advance the proceeds either to Consarc or Guterl, as it chose.

Consarc's attorney, Steven Heath, Esq., who attended the meeting, later testified that Consarc agreed to complete the furnaces only if Marine promised to disburse the loan proceeds directly to his client. Consarc's vice president, James Metcalf, stated the general discussion at the meeting involved promises of direct payment by the bank to Consarc. Guterl's president, Douglas Pinner, also testified that he was at the meeting and understood that "all payments were to be made directly from the banks to Consarc." Contrary evidence was given by Marine's lawyer, Raymond Seitz, Esq., who declared in a May 24, 1989 affidavit that the subject of direct disbursement of the loan proceeds was not raised in the meeting. Marine was never asked, he averred, nor did it ever promise, to pay funds to Consarc directly.

A series of letters followed the face-to-face meeting. Unfortunately, they do not resolve the parties' different understandings respecting disposition of the loan moneys. Shortly after October 7 Marine received a brief letter dated October 13, 1981 from Consarc representative Metcalf. It stated that Consarc guaranteed it would complete the equipment and carry any "short-fall" in Guterl's payments in an open account. Consarc confirmed it would not use such short-fall, if any, as an excuse to delay completion of the furnaces and further agreed that the bank might make any filings necessary to protect its interest in the furnaces. By its terms, Consarc's October 13 guarantee to complete and install the furnaces was made "provided all payments included in Schedule B attached hereto are paid." Schedule B listed certain payments, but did not explicitly state whether payments were to be made directly to Consarc or to Guterl.

In response to Consarc's October 13 letter, Charles Moran, Marine's Commercial Finance Officer, sent a letter dated October 28 to Consarc attorney Heath. That letter in part requested Heath to provide an opinion letter confirming that the "letter agreements between Marine and Consarc dated October 13, 1981" were executed by an authorized officer and would remain in effect until delivery of the furnaces. Enclosed with the letter was the security agreement between Consarc and Marine. In a letter dated October 29 Heath responded and acknowledged that Metcalf's October 13 letter constituted the "valid and binding obligation" of Consarc.

Marine made the loan to Guterl on October 29, 1981. Consarc and Marine executed the security agreement the same day. Marine proceeded to pay $744,720.10—the first installment of the loan—directly to Guterl. That amount went to reimburse Equimark Commercial Finance which, as noted, had with Marine provided Guterl with an uninsured revolving line of credit since 1979. At Guterl's direction and, as permitted by the loan agreement between Guterl and the bank, Marine then paid the remaining $6,755,279.90 directly to Consarc. Consarc was unaware of the $744,720.10 initial payment to Guterl until it inquired in early 1982

about the remaining balance of the loan proceeds. Shortly thereafter Guterl entered bankruptcy.

Consarc filed the instant suit against Marine in 1987 seeking the $744,720 balance, claiming that Marine had entered into an oral agreement with it on October 7, 1981 to pay the entire $7.5 million directly to it. Consarc also asserted that the exchange letters evidenced a binding obligation on Marine to pay the $7.5 million directly to it. On May 15, 1989 Marine moved for summary judgment. Following a hearing, the district court rejected Consarc's arguments and in an order entered July 2, 1992 granted Marine's motion for summary judgment. This appeal followed.

## DISCUSSION

### I Summary Judgment

We review a grant of summary judgment *de novo* using the same tests as those applied in the district court. *See Owens v. New York City Housing Auth.,* 934 F.2d 405, 408 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991). Extensive jurisprudence developed in the Supreme Court and in our Circuit provides well-established standards governing review of a Rule 56 motion for summary judgment. A party moving for summary judgment bears the burden of establishing that no genuine issue of material fact remains for trial. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Eastman Mach. Co. v. United States,* 841 F.2d 469, 473 (2d Cir.1988).

The district court's role—and our role on appeal—requires the court not to resolve disputed issues of fact itself, but rather to see if there are issues of fact to be resolved by the factfinder at trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). That is to say, when examining the record before it to see if there are any genuine issues of material fact, the court's focus is on issue-finding, not on issue-resolution. In making its assessment, the trial court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its

favor. *See United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962) (per curiam).

These procedural rules governing the use of summary judgment cannot properly be applied without examining the substantive law applicable in the underlying litigation since that law dictates which facts are material in a given case. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Summary judgment will be granted against a party that has failed to offer proof sufficient to establish the existence of an essential element of its case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). As Consarc's claim arises in a diversity case based on New York contract law, New York law defines the essential elements Consarc must prove in its suit against Marine. We turn now to an analysis of the record to see if any genuine issues of material fact respecting the existence of a contract between Consarc and Marine exist.

### II The "Letters Agreement"

Consarc contends the district court should have found the October 13, 1981 letter ambiguous and then considered parol evidence to interpret it. This extrinsic evidence, so the argument goes, raises factual questions that cannot be resolved on summary judgment. We think the trial court erroneously viewed the October 13 letter not as a contract, but simply a unilateral assurance by Consarc. The mistake arose because the letter was considered independently from the other letters exchanged by the parties and from the security agreement, which they both executed.

Under New York law a written contract may be formed from more than one writing. *See Crabtree v. Elizabeth Arden Sales Corp.,* 305 N.Y. 48, 53–55, 110 N.E.2d 551 (1953); *Nolfi Masonry Corp. v. Lasker-Goldman Corp.,* 160 A.D.2d 186, 187, 553 N.Y.S.2d 156 (1st Dep't 1990). Relevant writings creating a contract may consist of letters bearing the signature of only one party or even memoranda unsigned by either party. *Crabtree,* 305 N.Y. at 53–55, 110

N.E.2d 551; *Weiner & Co. v. Teitelbaum,* 107 A.D.2d 583, 584, 483 N.Y.S.2d 313 (1st Dep't 1985).

■ Here the parties exchanged several letters: two dated October 13 written by Metcalf on behalf of Consarc, one of October 28 written by Marine's Commercial Finance Officer, and one of October 29 from Consarc's corporate counsel, Steven Heath, Esq. The October 28 letter from Marine specifically referred to the "letters agreement between Marine and Consarc dated October 13, 1981" and noted that the "Security Agreements" were enclosed with the letter. Those security agreements bear the endorsements of both Consarc and Marine and the combined writings contain no expression by either party of any intent not to be bound by them. The failure of the writings to contain a disavowal is one of the common law principles courts rely on in deciding whether several writings together form a contract between the parties. *See Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 72–73 (2d Cir.1989).

■ Another reason refutes Marine's argument that Consarc's October 13 letter represented only a unilateral guarantee that Consarc would complete the furnaces, provided specified payments were made in accordance with the attached schedule. A unilateral offer may be accepted by the other party's conduct and thereby give rise to contractual obligations. *See John William Costello Assocs. v. Standard Metals Corp.,* 99 A.D.2d 227, 231, 472 N.Y.S.2d 325 (1st Dep't 1984); *Novack v. Bilnor Corp.,* 26 A.D.2d 572, 573, 271 N.Y.S.2d 117 (2d Dep't 1966). Thus, even if the October 13 letter was interpreted, standing alone, as a unilateral promise, Marine might have demonstrated its acceptance of that offer by making payments in accordance with the schedule that had been attached. Questions concerning the precise terms of Consarc's unilateral agreement to perform and whether Marine accepted it through its conduct would then raise questions of fact to be adjudicated at trial. We need not address this point because the October 13 letter constituted only one of several documents comprising the written agreement between the parties. Hence, this correspondence and the security agreement may together establish a contract between Consarc and Marine, the precise terms of which are admittedly unclear and present distinct factual questions that must be addressed separately.

■ To determine the terms of a contract a court must ascertain the parties' intent based on the language they used. *See Slatt v. Slatt,* 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645, 477 N.E.2d 1099 (1985). Interpreting the agreement requires consideration as to whether any terms of that agreement are ambiguous. Whether a contract's terms are ambiguous is a question of law decided by the court. *See W.W.W. Assocs. v. Giancontieri,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990); *Van Wagner Advertising Corp. v. S & M Enters.,* 67 N.Y.2d 186, 191, 501 N.Y.S.2d 628, 492 N.E.2d 756 (1986). An ambiguous term is one about which reasonable minds could differ. *See Seiden Assocs. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992); *Care Travel Co. v. Pan American World Airways, Inc.,* 944 F.2d 983, 988 (2d Cir.1991); *Van Wagner Advertising,* 67 N.Y.2d at 191, 501 N.Y.S.2d 628, 492 N.E.2d 756.

■ If a contract is unambiguous, courts are required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning. *See Care Travel Co.,* 944 F.2d at 987–88; *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir.1990); *Hudson–Port Ewen Assocs. v. Chien Kuo,* 78 N.Y.2d 944, 945, 573 N.Y.S.2d 637, 578 N.E.2d 435 (1991); *W.W.W. Assocs.,* 77 N.Y.2d at 162–63, 565 N.Y.S.2d 440, 566 N.E.2d 639. That is, extrinsic evidence may not be used to create an ambiguity in an otherwise unambiguous agreement. *See W.W.W. Assocs.,* 77 N.Y.2d at 162, 565 N.Y.S.2d 440, 566 N.E.2d 639; *see also* 17A Am.Jur.2d Contracts § 337 (1991). Where reasonable minds could be said to differ because the language the parties used in their written contract is susceptible to more than one meaning—each as reasonable as the other—and where extrinsic evidence of the parties' actual intent exists, it should be submitted to the trier of fact. *See Seiden Assocs.,* 959 F.2d at 428.

Several ambiguities appear in the October 13 letter. First, though the letter refers to payments to be made by Marine in accordance with Schedule B, the schedule does not identify to whom payments are to be made. Reasonable minds could differ as to whether payments are to be made from Marine to Consarc, the party who authored the letter, or to Guterl, the party who had borrowed the money. Second, the letter refers to a potential "short-fall" in payments by Guterl without clarifying what that term means. Third, the letter also mentions certain "deposits" made by Guterl, but fails to explain what those deposits represent. The letter may possibly be the result of poor draftsmanship by Consarc, which Marine failed to clarify. Thus, the agreement between Consarc and Marine is ambiguous, and none of the other letters or the security agreement resolves the highlighted ambiguities.

■ Resolving an ambiguous term in a written contract through extrinsic evidence remains squarely within the province of the trier of fact. *See Town of Wilson v. Town of Newfane*, 181 A.D.2d 1045, 1045, 581 N.Y.S.2d 962 (4th Dep't 1992). For that reason, summary judgment in such circumstances is inappropriate. *See Long Island Airports Limousine Serv. Corp. v. Playboy–Elsinore Assocs.*, 739 F.2d 101, 103 (2d Cir. 1984). In the present case, viewing the evidence in the light most favorable to Consarc, sufficient extrinsic evidence supports Consarc's view that payments were to be made from Marine directly to it. Testimony from individuals present at the October 7 meeting raises questions as to whether Marine promised to make direct payment to Consarc. As some extrinsic evidence supports Consarc's view of the October 13 letter and its attached Schedule B, summary judgment should have been denied. Instead, this issue must be presented at trial for the trier of fact to determine the parties' intent.

### III  The "Oral Agreement"

#### A.  *Rules Governing Whether there is a Binding Agreement Absent a Writing*

Consarc alternatively avers that the bank reached an oral agreement on October 7, 1981 for direct payment to it of the entire loan proceeds. Marine claimed in its motion for summary judgment that no such promise had been made and asserted that it had not intended to enter into a binding agreement with Consarc in the absence of a formal, written document. Consarc responded that factual issues remained as to whether the parties entered an oral agreement October 7, and what oral promises the bank made that day.

■ Simply because the parties contemplate memorializing their agreement in a formal document does not prevent their agreement from coming into effect before written documents are drawn up. *See R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir.1984); *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 261 (2d Cir.), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984); *V'Soske v. Barwick*, 404 F.2d 495, 499–500 (2d Cir.1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969). That is, if the parties have settled on the contract's substantial terms, a binding contract will have been created, even though they also intended to memorialize it in a writing. *V'Soske*, 404 F.2d at 499–500; *Litton Indus. v. Lehman Bros. Kuhn Loeb Inc.*, 767 F.Supp. 1220, 1227 (S.D.N.Y.1991), *rev'd on other grounds*, 967 F.2d 742 (2d Cir.1992); *S.J. Groves & Sons Co. v. L.M. Pike & Son, Inc.*, 41 A.D.2d 584, 584–85, 340 N.Y.S.2d 230 (4th Dep't 1973). Yet, if the parties do not intend to enter a binding agreement without a writing, they will not be legally bound until that condition is met. *See Tebbutt v. Niagara Mohawk Power Corp.*, 124 A.D.2d 266, 268, 508 N.Y.S.2d 69 (3d Dep't 1986); *Buschman v. Diamond Shamrock Corp.*, 35 A.D.2d 926, 316 N.Y.S.2d 590 (1st Dep't 1970).

The common law principles earlier referred to were succinctly summed up by Jessel, M.R., in *Winn v. Bull*, 7 Ch.D. 29 (1877), where a defendant had agreed in writing to lease a house from the plaintiff for a given term and at a specified rent, "subject to the preparation and approval of a formal contract." Master of the Rolls Jessel said:

It comes, therefore, to this, that where you have a proposal or agreement made in writing expressed to be subject to a formal contract being prepared, it means what it says; it is subject to and is dependent upon a formal contract being prepared. When it is not expressly stated to be subject to a formal contract it becomes a question of construction, whether the parties intended that the terms agreed on should merely be put into form, or whether they should be subject to a new agreement the terms of which are not expressed in detail. The result is, that I must hold that there is no binding contract in this case, and there must therefore be judgment for the Defendant.

*Id.* at 32. The Chancery Division determined that "question of construction" or fact against the plaintiff.

In 1894 the New York Court of Appeals reviewed an exchange of writings and wires between a buyer and seller of ten railroad carloads of apples. The seller proposed that the railcars be shipped ten days apart and the buyer accepted, provided shipments were separated by only eight days, to which modification the seller acquiesced. The New York Court observed that once agreement has been reached upon all the terms, as it was in that case, reducing it to writing "to the precise form intended ... did not affect the obligations of either party, which had already attached." *Sanders v. Pottlitzer Bros. Fruit Co.*, 144 N.Y. 209, 214, 39 N.E. 75 (1894). The Supreme Court reached the same conclusion: "Of course the expressed contemplation of a more formal document did not prevent the letters from having the effect that otherwise they would have had." *American Smelting and Refining Co. v. United States*, 259 U.S. 75, 78, 42 S.Ct. 420, 421, 66 L.Ed. 833 (1922) (Holmes, J.).

These common law rules have guided this Circuit for over 75 years.

When parties enter into a mere verbal agreement, with the understanding that it shall be finally reduced to writing as the evidence of the terms of the contract, it may be that nothing is binding upon either party until the writing is executed. But where the parties reach an agreement through correspondence, intending that the agreement shall be subsequently expressed formally in a single paper or document, which, when signed, should be the evidence of what had been agreed upon, the obligatory character of the agreement cannot ordinarily be defeated by the failure of either party to sign the formal contract. If the court can see from the writings or correspondence that the minds of the parties have met, that a proposal has been submitted by one party which has been accepted by the other, and that the terms of the contract have been in all respects definitely agreed upon, one of the parties cannot evade or escape from his obligation by refusing to sign the formal contract, which the parties understood was subsequently to be drawn and executed.

*United States v. P.J. Carlin Constr. Co.*, 224 F. 859, 862–63 (2d Cir.1915); *accord Lehigh Structural Steel Co. v. Great Lakes Constr. Co.*, 72 F.2d 229, 230–31 (2d Cir.1934) (Augustus Hand, J.) (citing and relying on *Winn v. Bull* and *Pottlitzer Bros. Fruit Co.*); *see also V'Soske*, 404 F.2d at 499 (adopting the same rules).

Courts and commentators have suggested an array of factors for the factfinder to consider in determining whether parties intend to be bound absent a writing. In *Banking & Trading Corp. v. Floete*, 257 F.2d 765, 769 (2d Cir.1958), a comprehensive catalogue—drawing on *Mississippi & Dominion Steamship Co. v. Swift*, 86 Me. 248, 29 A. 1063, 1067 (1894)—was set forth. Scholarly writers in the field of contract law have also pointed out factors to be examined in resolving the factual inquiry. Although an exhaustive list will not be produced, some of the most common factors relied on in determining intent include: (1) number of terms agreed upon compared to total number to be included, (2) relationship of the parties, (3) degree of formality attending similar contracts, (4) acts of partial performance by one party accepted by the other, (5) usage and custom of the industry, (6) subsequent conduct and interpretation by the parties themselves, (7) whether writing is contemplated merely as a "memorial," (8) whether contract needs a formal writing for its full expression,

(9) whether any terms remain to be negotiated, (10) whether contract has few or many details, (11) whether amount involved is large or small, (12) whether a standard form is widely used in similar transactions or whether this is an unusual type of contract. *See* Restatement (Second) of Contracts § 27 cmt. c (1981); 1 Samuel Williston, A Treatise on the Law of Contracts § 4:8 at 302–12 (Richard A. Lord ed., 4th ed. 1990); 1 Arthur L. Corbin, Corbin on Contracts § 30, at 104–12 (1963). To these might be added (13) the speed with which the transaction must be concluded, (14) the simplicity or complexity of the transaction, (15) the availability of information necessary to decide whether to enter into a contract, and (16) the time when the contract was entered into. Subsequent cases in our Court have refined and reduced their number. *See, e.g., Horn & Hardart Co.,* 751 F.2d at 75–76 (four factors—parties' statements, partial performance, anything remaining to be negotiated, whether subject matter is one normally requiring a written contract); *Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 80 (2d Cir.1985) (same). Although no single factor may be decisive, we believe that where applicable each provides guidance. *See Horn & Hardart Co.,* 751 F.2d at 75.

Hence, in determining a party's intent not to be bound under such circumstances, the factfinder must examine the applicable objective signs given by that party. *See id.* at 74. We have just elaborated on how that intent may be shown by setting forth an extensive laundry list of factors that might help the factfinder in making its decision. While the district court applied a number of these factors in this case, it incorrectly failed to view the proof in the light most favorable to Consarc, the non-moving party. In our view, the evidence in the case at hand does not reveal uncontroverted objective signs evincing an intent not to be bound.

### B. *Application of the Rules to Instant Case*

Consarc's attorney testified that the attorneys present at the October 7 meeting were to draw up letters containing the terms of Consarc's and Marine's agreement. This supports an understanding of the documents as memorializing the parties' agreement. But the testimony sheds no light on whether either party intended not to be bound until those documents were drawn and executed. In sharp contrast, Marine's attorney states in an affidavit that the bank did not intend to be bound without a writing.

█ Whether a contracting party intends not to be bound in the absence of a writing is a question of fact to be presented for resolution to the factfinder at trial. *See S.J. Groves & Sons,* 41 A.D.2d at 584–85, 340 N.Y.S.2d 230; *Buschman,* 35 A.D.2d 926, 316 N.Y.S.2d 590. We have previously held summary judgment an improper procedural vehicle for determining the parties' intent not to be bound in the absence of written agreements—even in cases where evidence strongly suggests the contrary. *See Babdo Sales, Inc. v. Miller–Wohl Co.,* 440 F.2d 962, 965 (2d Cir.1971).

Marine particularly relies on an affidavit prepared by Raymond Seitz, Esq., Marine's lawyer who was present at the October 7, 1981 meeting. His affidavit dated May 24, 1989 states that the parties agreed that any understanding regarding their arrangement would be put in writing. In contrast, the testimony of Consarc's attorney, Steven Heath, Esq., states only that the agreements would be reduced to writing, without mentioning any intent not to be bound without such a written contract.

But attorney Seitz' affidavit fails to support conclusively an expressed intention not to be bound without a writing. Fact finders examining intent are instructed to look to the time of contracting. *See Litton Indus.,* 767 F.Supp. at 1228–30; *Stetson v. Duncan,* 707 F.Supp. 657, 666 (S.D.N.Y.1988); *see also IBM Poughkeepsie Employees Fed. Credit Union v. Cumis Ins. Soc'y, Inc.,* 590 F.Supp. 769, 772 (S.D.N.Y.1984). In so doing, they must consider the objective intentions of the parties manifested at that time. *Horn & Hardart Co.,* 751 F.2d at 74–75. Since Seitz' affidavit comes quite late—sworn to seven and one-half years following the meeting—it carries little weight on Marine's objective intent allegedly expressed on October 7, 1981. Attorney Heath's testimony that the

meeting largely concerned what the writings would say does not bolster Marine's position since it actually supports the formation of an oral agreement to be memorialized later in a writing.

The remaining factors that have application similarly highlight the factual dispute over the parties' intent not to be bound without a writing. Consarc asserts that there was some partial performance of the alleged contract on Marine's part suggesting a promise to Consarc of direct payment. Certainly after paying out the first $744,720.10 to Guterl, Marine did act as if it had entered an agreement to pay the entire proceeds directly to Consarc. For the purpose of determining whether the parties intended to be bound absent a written agreement, that evidence shows part performance sufficient to contribute to the factual dispute over the ultimate issue of the parties' intent. Another factor, asking if any of the terms remain to be negotiated, cuts against finding a contract since concededly there were some unagreed upon terms. The district court believed that direct payment of loan proceeds to a third party would be the sort normally committed to writing. But no evidence was adduced to support that finding and the district court itself found that the agreement did not fit squarely within the statute of frauds.

We think it unnecessary to address the statute of frauds at this stage, and simply hold that Marine made an inadequate factual showing that the oral agreement as to direct payment was an unusual sort of contract usually committed to writing, particularly since the evidence strongly suggests that an oral agreement of some sort was reached between Marine and Consarc concerning the $7.5 million loan to Guterl. In addition, it was a simple arrangement, without many details, though concededly for a large amount of money, where speed was of some importance due to modernization plans, and both parties had all the information they needed on October 7 to decide whether to agree. The facts in this record do not unequivocally support the finding of unambiguousness urged by Marine and adopted by the district court.

## CONCLUSION

We therefore hold that there exist genuine issues of material fact with respect to whether the parties reached an oral agreement on October 7, 1981, and also regarding whether the exchange of letters between Marine and Consarc formed a written contract. The district court wrongly believed that as a matter of law Marine intended only to be bound by an agreement in writing. Because we think it was clearly erroneous for the district court to make the findings it did in resolving the parties' ambiguous agreement, it was also error, predicated on those erroneous findings of fact, to grant the bank's motion for summary judgment. Accordingly, we reverse the judgment of the district court and remand the case for a trial on the merits.

Reversed and remanded.