UNITED STATES of America, for the Use and Benefit of SAUNDERS CONCRETE CO., INC., Plaintiff,

v.

TRI–STATE DESIGN CONSTRUCTION CO., INC., and Employers Insurance of Wausau, a Mutual Company, Defendants.

No. 92–CV–1466 (FJS/DNH).

United States District Court, N.D. New York.

Sept. 30, 1995.

Melvin & Melvin, Syracuse, New York, for Plaintiff (Roger W. Bradley and Susan E. Otto, of counsel).

Adorante, Turner & Meyers, P.C., Camillus, New York, for Defendants (Anthony P. Adorante, of counsel).

## DECISION AND ORDER

SCULLIN, District Judge.

### Introduction

This is an action under the New York Uniform Commercial Code for damages arising out of the installation of allegedly defective concrete by plaintiff Saunders Concrete Co. ("Saunders"). Saunders' claim against Tri–State Design Construction Co. ("Tri–State"), the buyer of the concrete, for the contract price has been settled. Thus, the only claim remaining in the case is Tri–State's counterclaim seeking consequential damages for breach of contract.

The matter comes before the Court on Tri–State's motion for joinder of a third-party defendant, Atlantic Testing Laboratories ("Atlantic") and Saunders' motion for summary judgment on Tri–State's counterclaim.

### Background

On November 9, 1992, plaintiff Saunders filed a summons and complaint against defendants Tri–State and Employers Insurance of Wausau alleging that they failed to pay for concrete sold and delivered by Saunders in the amount of $26,939.06. Saunders' Complaint ¶ 12. Defendant Tri–State counter-claimed, seeking $100,000 damages for Saunders' alleged breach of the contract. Tri–State's Answer ¶ 6. On October 19, 1993, the parties settled Saunders' $26,211.71 claim for payment under the contract by agreeing that Tri–State would pay $25,726.41, plus interest, with the remaining $485.30 as a counterclaim or setoff to Tri–State's damages claim. October 19, 1993 Order at 1–2.

Tri–State entered into a contract with the United States of America, Small Business Administration, in furtherance of a contract made between the Federal Aviation Administration and the Small Business Administration, for the construction of a building at the Syracuse–Hancock International Airport. Otto Aff.Ex.B. Subsequently, Tri–State entered into a contract with Saunders to supply the required concrete—six cubic yards of 4,000 pound concrete at a slump[1] of four inches—in accordance with ASTM standards. Otto Aff.Ex.A. Tri–State also entered into a contract with Atlantic on July 12, 1991, whereby Atlantic agreed to provide an ACI-certified technician to inspect, test, and approve or reject the concrete delivered by Saunders. Adorante Aff. ¶¶ 4, 5, 7. Although Atlantic provided an inspector, Tri–State later learned that the inspector was not ACI-certified. O'Konski Aff. ¶ 11.

At 8:16 a.m., on September 5, 1991, Saunders batched the concrete and delivered it to the airport at approximately 8:59 a.m. Otto Aff.Ex. 9. The delivery slips indicated that the six yards of concrete contained only 27.8 gallons of water per yard, instead of the required 30 gallons per yard. Otto Aff.Ex. 13. Because the concrete was too stiff and would not come down the chute, Tri–State's superintendent told Saunders' truck driver to produce the proper slump. Notice of Motion Ex 10, Kubacki Dep. at 19–20 (hereinafter "Kubacki Dep."). Water was added several times before the proper slump was achieved and the concrete poured. Kubacki Dep. at 20–24. Prior to pouring, Atlantic concluded

---

1. Slump is the measurement of the concrete's stiffness and workability. The number of inches is inversely proportional to the level of stiffness (i.e. concrete with a slump of five inches is less stiff than concrete with a slump of two inches).

that the temperature (82° F) and slump of the concrete (5 inches) was acceptable. Otto Aff.Ex. 13. It is unclear what time the water was added and the cement poured. Kubacki Dep. at 21, 26.

After most of the concrete had been poured, the concrete remaining in the truck became stiff, and Tri–State's superintendent ordered that more water be added so that the proper slump could be achieved and the job finished. Kubacki Dep. at 35. However, the superintendent examined the concrete and decided not to pour it because it was "done." Kubacki Dep. at 35. Subsequently, Tri–State signed the delivery ticket, acknowledging that it "inspected, approved and received" the concrete and had authorized the addition of eighteen gallons of water. Kubacki Dep. at 46–48; see Otto Aff., Ex. 9. However, it is unclear what portion of the eighteen gallons was added to the concrete actually used. Later that day, another Saunders' truck finished the job by delivering one cubic yard of cement. Kubacki Dep. at 65.

Subsequent strength tests of the concrete at seven and twenty-eight days after delivery revealed that the concrete was under strength. Otto Aff.Ex. 13. Further tests revealed that the concrete was under strength because it contained too much water. Otto Aff.Ex.B. Tri–State seeks damages, including the costs and expenses incurred: (1) in removing and replacing the defective concrete and (2) as a result of significant delays in the airport project. Tri–State's Answer ¶¶ 6, 7.

The Court will first consider Tri–State's motion for joinder of Atlantic, and then evaluate Saunders' motion for summary judgment.

## Discussion

### A. Joinder

Fed.R.Civ.P. 20(a) provides:

All persons ... may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.

In the alternative, Rule 20(b) provides: The court may make such orders as will prevent a party from being embarrassed, delayed, or put to expense by the inclusion of a party against whom the party asserts no claim and who asserts no claim against the party, and may order separate trials or make other orders to prevent delay or prejudice.

■ Rule 20 "is to be construed liberally in order to promote trial convenience and to expedite the final determination of disputes, thereby preventing multiple lawsuits." *League to Save Lake Tahoe v. Tahoe Regional Planning Agency,* 558 F.2d 914, 917 (9th Cir.1977) (citing *Mosley v. General Motors Corp.,* 497 F.2d 1330 (8th Cir.1974)).

■ In order for Tri–State to join Atlantic, Tri–State must first show that its right to relief against both Atlantic and Saunders arises out of the same transaction or occurrence, pursuant to Rule 20(a). Courts have taken a case-by-case approach to this issue. *See* Wright, Miller & Kane, Federal Practice and Procedure § 1653 at 382 (1986). The Eighth Circuit stated that a transaction or occurrence under Rule 20 was "all 'logically related' events entitling a person to institute a legal action against another." *Mosley v. General Motors Corp.,* 497 F.2d 1330, 1333 (8th Cir.1974). Other courts have found a single transaction or occurrence where there would be an overlapping of proof and the duplication of testimony, thereby causing delay, inconvenience and added expense to the court and parties involved. Wright, Miller & Kane, Federal Practice and Procedure § 1653 at 385.

Tri–State alleges that Saunders supplied defective concrete as a result of improper mixing at the plant or the addition of water at delivery. O'Konski Aff. ¶ 14. Tri–State also alleges that Atlantic improperly inspected the concrete, thereby failing to discover the defect and causing Tri–State's loss. O'Konski Aff. ¶¶ 15–17. In both instances, the cause of action arises out of the same transaction or occurrence—the delivery and installation of the concrete. Further, the

adding of water by Saunders' driver and the contemporaneous inspection of the concrete by Atlantic's agent are "logically related" events in which the testimony and proof involved would overlap. Thus, Tri–State's right to relief against Saunders and Atlantic arises out of the same transaction or occurrence. Fed.R.Civ.P. 20(a).

Next, Tri–State must demonstrate that a common question of law or fact will arise. Rule 20(a) requires only that there be at least one common question of law or fact. Wright, Miller & Kane, Federal Practice and Procedure § 1653 at 387 (citing *Hall v. E.I. Du Pont De Nemours & Co.*, 345 F.Supp. 353, 381 (E.D.N.Y.1972)). Although this case may involve different bases of liability concerning the duties owed by Saunders and Atlantic, it involves identical factual issues concerning the condition of the concrete (i.e., whether it was clearly defective upon delivery), the actions taken by the various parties at the time of delivery (i.e., whether too much water was added), and the damages sustained by Tri–State. Therefore, there are common questions of fact.

Pursuant to Rule 20(b), Saunders argues that the Court should order a separate trial for Tri–State's action against Atlantic because Tri–State delayed seeking Atlantic as a defendant and has made no claim, supported by sufficient facts, against Atlantic. Saunders' Memo of Law at 2–4; *see* Adorante Aff. ¶ 8. Tri–State defends its actions, arguing that without discovery and a trial, no one can know where the ultimate responsibility for Tri–State's damage should be placed. Tri–State's Memo of Law at 14.

Clearly, the purpose of Rule 20 is to allow the joinder of parties when it will prevent delay and prejudice. *See, e.g., Mosley v. General Motors Corp.*, 497 F.2d 1330 (8th Cir.1974). One instance where this policy is furthered is where a plaintiff is in doubt as to which defendant is liable in regards to the same controversy. *See United States v. Carolina Warehouse Co.*, 4 F.R.D. 291, 291–93 (D.S.C.1945). As the South Carolina District Court stated: "Rule 20 ... undoubtedly contemplates that in such a situation as is here presented the entire controversy should be submitted to the court at one time for deter-mination." *Id.* at 293. The case at bar is such a situation. Thus, to prevent delay and prejudice this controversy should be decided in one trial.

Based upon the foregoing analysis, Tri–State's Rule 20 joinder motion is GRANTED because Tri–State's claim against Saunders and Atlantic arises out of the same transaction or occurrence, common questions of fact will arise, and a separate trial would cause delay and prejudice.

## B. Summary Judgment

### 1. Standard

Rule 56(c) provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When the non-movant bears the burden of proof on an issue, the movant satisfies its summary judgment burden by demonstrating the absence of evidence to support an essential element of the non-movant's claim. *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572 (2d Cir.1993). Once a moving party has demonstrated that no genuine issue of material fact exists, the burden shifts to the non-movant to set forth specific facts which show that there is indeed a genuine issue for trial. Fed.R.Civ.Pro. 56(e); *Consarc*, 996 F.2d at 572.

A material factual issue is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material issue of fact does not exist "when reasonable minds cannot differ as to the import of the evidence before the court." *Commander Oil, Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir.1993); *Andersen*, 477 U.S. at 250–51, 106 S.Ct. at 2511–12. Furthermore, when deciding if a material issue of fact exists, the trial court must view the evidence in the light most favorable to the non-moving party and "draw all reasonable

inferences in its favor." *Consarc*, 996 F.2d at 572; *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam).

### 2. Substantive Legal Principles

In its counterclaim, Tri–State seeks $100,-000 in damages for Saunders' alleged breach of the contract. Tri–State's Answer (4) ¶ 6. The New York Uniform Commercial Code [2] contains two different provisions concerning a buyer's recovery of damages for the non-conformity of delivered goods. If a buyer has rejected, or revoked acceptance of, the delivered goods, the buyer's recovery of damages is controlled by N.Y.U.C.C. § 2–715. However, if a buyer has accepted goods and failed to revoke the acceptance, that buyer's recovery of damages falls under N.Y.U.C.C. § 2–714. Therefore, before addressing the issue of damages, a court must determine whether the goods were accepted, rejected or revoked.

#### a. Acceptance, Rejection or Revocation

With regard to acceptance, N.Y.U.C.C. § 2–606(1) provides in pertinent part:

Acceptance of goods occurs when the buyer

(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or

(b) fails to make an effective rejection (subsection (1) of Section 2–602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them.

With regard to rejection, N.Y.U.C.C. § 2–602(1) states: "Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." Further, once goods have been accepted, they may no longer be rejected. *See* N.Y.U.C.C. § 2–607(2).

With regard to revocation, N.Y.U.C.C. § 2–608 provides in pertinent part:

(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or

(b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

#### b. Damages

If a buyer has accepted the goods and has not revoked that acceptance, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller or be barred from any remedy." N.Y.U.C.C. § 2–607(3)(a). If he does so, the buyer "may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." N.Y.U.C.C. § 2–714(1).

In the opposite case, where the buyer has rejected the goods or revoked the acceptance, the buyer may recover damages under N.Y.U.C.C. § 2–715, which provides in pertinent part:

(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(2) Consequential damages resulting from the seller's breach include

---

**2.** Although the contract did not contain a choice of law provision designating New York State, both parties agree that the New York Uniform Commercial Code applies.

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise.

### 3. Analysis

The evidence submitted by the parties presents several issues of material fact that prevent the Court from awarding summary judgment to Saunders.

### a. Acceptance, Rejection and Revocation

■ First, the question of whether Tri–State accepted, rejected or revoked the concrete hinges upon the issue of whether Tri–State had knowledge of the non-conformity at the time of delivery. This issue and the facts surrounding it are clearly in dispute.

Saunders contends that Tri–State knew of the concrete's unworkable condition, improper slump, and the addition of eighteen gallons of water and the pouring of the concrete after the ASTM's ninety-minute standard. Saunders' Memo of Law at 6–9; *see* Otto Aff.Ex. 4 at ¶ 12; Kubacki Dep. at 10, 20, 21, 23, 26; ASTM C–94 Standards § 11.7. Therefore, Saunders contends that Tri–State accepted the concrete under N.Y.U.C.C. §§ 2–606(1) and 2–602(1) because Tri–State, after having a reasonable opportunity to inspect, either signified to Saunders that it would keep the goods in spite of the non-conformity or failed to reject the goods within a reasonable time after delivery. Further, Saunders argues that Tri–State's knowledge of all the facts precludes Tri–State from revoking its acceptance pursuant to N.Y.U.C.C. § 2–608(1)(a) and (b) because the acceptance was not "reasonably induced" by the difficulty of discovery or Saunders' assurances, and it was not reasonable for Tri–State to assume that the non-conformity would be cured. Saunders' Memo of Law at 9–10; *see* Kubacki Dep. at 9–10. In response, Tri–State denies that it had knowledge of the non-conformity, arguing that it did not discover the non-conformity until seven days after delivery, when the concrete failed its initial

strength test. Tri–State's Memo of Law at 4–5; *see* Otto Aff.Ex. 13; Kubacki Dep. at 30. First, Tri–State admits that upon arrival the concrete was unworkable and at an improper slump. Kubacki Dep. at 20. However, after the addition of water, the concrete became workable and achieved a proper slump.[3] Kubacki Dep. at 30.

Second, Tri–State disputes Saunders' claim that too much water was added to the concrete, citing Saunders' delivery slips which indicated that the concrete was short a total of 13.2 gallons. Tri–State's Memo of Law at 9; *see* Otto Aff.Exs. 9, 13. Although the total amount added, eighteen gallons, caused the amount of water in the concrete to exceed the total amount specified in the contract, thirty gallons, it is unclear exactly what amount of water was added to the concrete actually used. Tri–State's Memo of Law at 8–10; *see* Kubacki Dep. at 21, 24, 25, 26, 40. Therefore, Tri–State argues that it was possible that the concrete actually used contained the proper proportion of water.

Third, Tri–State disputes Saunders' allegations that water was added, and the concrete poured, after the ASTM's 90–minute standard. Tri–State claims that the mixing process could have been completed within the time limit because the time estimations by the witnesses were not exact. Tri–State's Memo of Law at 5–6; *see* Kubacki Dep. at 26, 30, 31, 39, 40.

The importance of the time limit when compared with the temperature of the concrete at delivery presents another factual issue. Tri–State argues that although the ASTM's 90–minute standard is an indication of when concrete may begin to set up, the true indicator of the concrete's condition is its temperature. Tri–State's Memo of Law at 8; *see* Adorante Aff. ¶¶ 5–6. Therefore, because the temperature of the concrete at delivery was below the 90–degree standard, the time standard was not important. *See* Otto Aff.Ex. 13.

Other questions of material fact essential to the determination of whether Tri–State

---

**3.** The contract specified that the slump was to be four inches. Although the slump achieved after the addition of water was five inches, ASTM standards tolerate a one inch variation. *See* ASTM C 94 at 6.1.2.

accepted or rejected the concrete are (1) whether Tri–State had a reasonable opportunity to inspect the concrete after delivery, under N.Y.U.C.C. § 2–606(1), and (2) whether Tri–State rejected the concrete within a reasonable time after delivery, under N.Y.U.C.C. § 2–602(1). Saunders claims that Tri–State reasonably inspected the goods at the time of delivery and accepted them without complaint, especially in light of the fact that Tri–State hired an inspector to oversee the delivery of the concrete. Saunders' Memo of Law at 8–10; see Kubacki Dep. at 10, 20, 22, 23, 24, 25. However, Tri–State argues that it "conditionally accepted" the concrete because it could not have possibly discovered the non-conformity of the concrete until the concrete was tested at seven and twenty-eight days after the pour. Tri–State's Memo of Law at 3–4; see Adorante Aff. ¶¶ 38, 40. Moreover, Tri–State claims that once it discovered the defect, it immediately notified Saunders. Tri–State Memo of Law at 3; see Otto Aff.Ex.C.

In considering these very same issues, New York Appellate Division, Third Department, denied summary judgment, stating: "the obvious dilemma associated with rejecting hardened concrete raise[s] an issue of fact regarding both the reasonableness of the time for rejecting the concrete and the manner of doing so." *Barrett Paving Materials, Inc. v. U.S. Fidelity and Guaranty Co.*, 118 A.D.2d 1039, 1041, 500 N.Y.S.2d 413, 414 (3d Dep't 1986); see also *Integrated Circuits Unlimited, Inc. v. E.F. Johnson Co.*, 691

F.Supp. 630, 634 (E.D.N.Y.1988) (possession of goods during time required to complete tests for non-conformity deemed not to be an acceptance of goods). *Cf. In re Gotham Silver Co.*, 91 F.Supp. 520, 524 (S.D.N.Y.1950) ("Notice following a lapse of over thirteen months after acceptance, and of over eighteen months from the time [the] buyer ought to have known of the breach is not, in the absence of unusual circumstances, given within a 'reasonable time.' "). Whether seven or twenty-eight days in this instance was a reasonable time is clearly an issue that cannot be decided as a matter of law. Thus, genuine issues of material fact remain with respect to whether Tri–State had a reasonable opportunity to inspect the concrete and whether Tri–State rejected the concrete within a reasonable time.

**b. Damages**

■ Apparently, both parties failed to recognize the fact that the determination of whether a buyer accepts, rejects or revokes under the N.Y.U.C.C. is not, in and of itself, dispositive regarding the buyer's claim for damages.[4] The issue of whether the buyer accepted, rejected or revoked concerns the buyer's duty to pay the contract price[5] *and* determines the U.C.C. provision under which the buyer may recover damages.[6] Therefore, contrary to Saunders' argument, acceptance of the concrete by Tri–State, even with "full knowledge of all facts," does not preclude Tri–State's counterclaim for damages.[7] Under the N.Y.U.C.C., a buyer's claim for

---

4. *See* Saunders' Memo of Law (32) pp. 9–10 ("Tri–State is precluded from rejecting the concrete and cannot revoke its acceptance, mandating dismissal of its claim as a matter of law."); Tri–State's Memo of Law (35) pp. 3–4 (arguing that Tri–State either rejected or revoked the delivery of the concrete).

5. N.Y.U.C.C. § 2–607(1) ("The buyer must pay at the contract rate for any goods accepted."); N.Y.U.C.C. § 2–602(2) (other than avoiding wrongful exercise of ownership and holding rejected goods with reasonable care, "buyer has no further obligations with regard to goods rightfully rejected."); N.Y.U.C.C. § 2–608(3) ("A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.").

6. N.Y.U.C.C. § 2–714, Official Comment 1 ("This section deals with the remedies available to the buyer after the goods have been accepted and the

time for revocation of acceptance has gone by."); N.Y.U.C.C. § 2–715, Official Comment 1 ("Subsection (1) is intended to provide reimbursement for the buyer who incurs reasonable expenses in connection with the handling of rightfully rejected goods or goods whose acceptance may be justifiably revoked ...").

7. N.Y.U.C.C. § 2–607(2) ("[A]cceptance of goods does not of itself impair any other remedy provided by this Article for non-conformity."); N.Y.U.C.C. § 2–607, Official Comment 6 ("For subsection (2) makes it clear that acceptance leaves unimpaired the buyer's right to be made whole, and that right can be exercised by the buyer not only by way of cross-claim for damages, but also by way of recoupment in diminution or extinction of the price.").

damages for non-conforming goods "is separate and apart from its indebtedness for the purchase price." *Sunny Side Up, Inc. v. Agway, Inc.,* 40 A.D.2d 899, 900, 337 N.Y.S.2d 567, 569 (3d Dep't 1972). The claim for damages is separate because the "overriding goal of UCC remedies [is] to put the wronged party in as good a position as it would have been if the other party had fully performed." *Fedmet Trading Corp. v. Ekco International Trade Corp.,* 151 Misc.2d 927, 930, 574 N.Y.S.2d 122, 124 (Sup.Ct.N.Y.County 1991).

▮ The only way Tri–State would be automatically barred from recovering damages would be if Tri–State failed to notify Saunders of the breach within a reasonable time of delivery, after accepting the concrete. N.Y.U.C.C. §§ 2–607(3)(a) and 2–714(1). Saunders never addresses this material issue of fact, and thus, never meets its burden of demonstrating the absence of evidence to support this essential element of Tri–State's damage claim. *Consarc,* 996 F.2d at 572. Therefore, the issue of whether Tri–State notified Saunders of the non-conformity within a reasonable time implicates genuine issues of material fact.

Without resolving the disputed factual issues of whether Tri–State knew of the non-conformity of the concrete, had a reasonable opportunity to inspect the concrete and rejected the concrete within a reasonable time after delivery, it is impossible for the Court to determine whether Tri–State accepted, rejected or revoked the concrete as a matter of law, and thus, which damage provision under the N.Y.U.C.C. should control. Further, even if the Court agreed with Saunders' argument that Tri–State had accepted the concrete, there would still remain the material, factual issue of whether Tri–State notified Saunders of the breach within a reasonable time after discovering it, as required by N.Y.U.C.C. § 2–714(1). Therefore, the summary judgment motion must be DENIED.

### Conclusion

Based upon the foregoing analysis, it is hereby

ORDERED, that Tri–State's motion to join Atlantic Testing is GRANTED. It is further

ORDERED, that Saunders' motion for summary judgment is DENIED.

**IT IS SO ORDERED.**