**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos.: 21-1712, 21-1713, and 21-1806
_____

In re: FIBER-SPAN, INC.,
                                    Debtor

TRANSIT WIRELESS, LLC

v.

FIBER-SPAN, INC.; ALLEGHENY CASUALTY
COMPANY

Allegheny Casualty Company,
                        Appellant in No. 21-1712

Daniel E. Straffi, Chapter 7 Trustee for Fiber-Span, Inc.,
                        Appellant in No. 21-1713

Transit Wireless, LLC,
                        Appellant in No. 21-1806
_____

On Appeal from the United States District Court
For the District of New Jersey
(D.C. Nos. 3-20-cv-02244 and 3-20-cv-02245)
District Judge: Honorable Anne E. Thompson

_____

Argued
January 19, 2022

Before:  JORDAN, RESTREPO, and PORTER, *Circuit
Judges*

(Filed: July 5, 2022)
_____

Scott J. Freedman
Benjamin W. Spang  [ARGUED]
Dilworth Paxson
457 Haddonfield Road – Suite 700
Cherry Hill, NJ  08002
        *Counsel for Daniel E. Straffi, Chapter 7
        Trustee for Fiber-Span, Inc.*

Michael D. Malloy
Finestein & Malloy
6 Commerce Drive – Suite 304
Cranford, NJ  07016

Michael E. Norton  [ARGUED]
Hand Baldachin & Associates
1740 Broadway – 15th Floor
New York, NY  10019
        *Counsel for Transit Wireless, LLC*

Adam P. Friedman
Chiesa Shahinian & Giantomasi
One Boland Drive
West Orange, NJ  07024

Michael Grohs  [ARGUED]
Saiber
18 Columbia Turnpike – Suite 200
Florham Park, NJ  07932
        *Counsel for Allegheny Casualty Company*

_____

OPINION OF THE COURT
_____


JORDAN, *Circuit Judge*.

Everyone, it seems, wants access to the internet and phone service all the time and everywhere, even when underground.  This case is about an unsuccessful effort to meet that demand in New York City.

Transit Wireless, LLC, secured a contract to bring telecommunications services to New York City's subway system.  As part of that project, Transit subcontracted with Fiber-Span, Inc., to develop remote fiber nodes (the "Nodes") to amplify telecommunication signals in the first six subway stations to receive such services.  The subcontract imposed on Fiber-Span responsibility for an extensive set of technical requirements and rigorous testing of the Nodes.  Fiber-Span also agreed to subsidize certain developmental costs in the hopes of being selected as the contractor for the project's

3

remaining 271 subway stations. In exchange, Transit agreed that, if Fiber-Span was not selected to supply Nodes for the remaining stations, Transit would reimburse those front-loaded costs. To close the deal, Fiber-Span obtained from Allegheny Casualty Company a performance bond in favor of Transit.

Strains in the relationship between Transit and Fiber-Span soon began to show, particularly when Transit raised technical concerns about the Nodes. In response, Fiber-Span retrofitted the Nodes, which addressed Transit's initial concerns but created other problems. Transit asserted that Fiber-Span remained in breach of contract after the retrofitting, but it nevertheless took the network live, even as the parties' relationship devolved from strained to broken. Transit insisted that Fiber-Span replace the retrofitted Nodes, while Fiber-Span said it would do so only after it was awarded a contract to supply them to the remaining subway stations. Those competing positions hardened over the course of a year. Although it became clear that Fiber-Span would not replace the Nodes, Transit continued to use them for two more years. Eventually, Transit sued both Fiber-Span and Allegheny in New York state court for the full value of the contract and more. Fiber-Span later filed for bankruptcy in the District of New Jersey, and the state claims ended up in the Bankruptcy Court there.

The Bankruptcy Court and, on appeal, the District Court came to different conclusions on a series of issues: namely, acceptance of the Nodes, breach of contract, resulting damages, and liability on the bond. We reach yet a third and somewhat different set of conclusions. In our view, Transit's decision to keep using the Nodes was consistent with the acceptance of non-conforming goods. And while Fiber-Span

4

indeed breached the contract, the damages it owes must reflect the difference in value between what Transit received and what it was promised, which is less than what the Bankruptcy Court and District Court awarded. Consistent with the reasoning of both those courts, however, we hold that Transit was not required to compensate Fiber-Span for not selecting it to provide Nodes for the remaining subway stations. Finally, we conclude that Transit's claim to the payment on the performance bond is time-barred, so Allegheny is not liable. We will thus affirm in part, vacate in part, and remand to the District Court with instructions to remand to the Bankruptcy Court to recalculate damages.

## I.      BACKGROUND

To untangle the several arguments and issues before us, a detailed factual recitation is required.

### A.      The Purchase Agreement

In 2007, Transit was awarded an exclusive license by the Metropolitan Transportation Authority and the New York City Transit Authority (collectively, the "MTA/NYCTA")[1] to bring telecommunications services to 277 New York City subway stations (the "License"). Under the License, Transit would, in turn, sell network access to telecommunications carriers to allow voice and data services to be delivered to their customers. Although Transit helped design and develop the network's engineering protocols and technical specifications, it was not capable of designing or manufacturing the network's

---

[1] Unfortunately, there are a few acronyms to keep track of in this story.

equipment. It therefore decided to subcontract that work to others.

The project was broken into two stages: the first six stations (the "Initial Build") and the remaining 271 subway stations (the "Full Build"). Transit selected Fiber-Span to develop, manufacture, and supply seventeen Nodes for the Initial Build. Their contract contemplated an extensive set of technical requirements, which included a testing and payment plan (the "Purchase Agreement") that incorporated by reference requirements laid out in the License. The parties ultimately settled on a purchase price of $704,382, which was later amended to $680,997. Fiber-Span agreed to obtain a performance bond to guarantee its work. And, in the hopes of being selected for the Full Build, it also agreed to cover certain research, development, and engineering costs of the project. In exchange, Transit promised that, if Fiber-Span was not selected for the Full Build, Transit would pay Fiber-Span $450,000, a sum they called the "initial build compensation" ("IBC"). Payment of the IBC, however, was contingent upon specified conditions being met, one of which was that the Nodes had to meet all quality requirements in the Purchase Agreement.

The Purchase Agreement required, among other things, that the Nodes operate properly in an ambient temperature of -25°C to 55°C; that power consumption be limited to a maximum of 395 watts; and that the Nodes have an ingress protection rating of "IP66."[2] Fiber-Span elsewhere warranted

---

[2] An "ingress protection" or "IP" rating measures the "grade [of] the resistance of an enclosure against the intrusion

6

that the Nodes would be "free from defects" and conform with the Purchase Agreement's specifications until the later of twenty-seven months after being delivered to Transit or twenty-four months after being put into operation (the "Warranty Provision"). (J.A. at 406.) It also guaranteed that any non-conforming Nodes would be repaired or replaced at Fiber-Span's cost for approximately twenty years, including any "de-installation and re-installation charges" (the "Repair and Support Provisions"). (J.A. at 406.)

Transit and Fiber-Span executed the Purchase Agreement on October 12, 2010. The parties agreed that New York state law would govern "any transactions or disputes arising [there]under[]." (J.A. at 417.) Simultaneous with its execution of the Purchase Agreement, Transit issued an order to purchase sixteen Nodes at a price of $704,382. For reasons not apparent on the record, it issued an amended purchase order in January 2011 that increased the number of Nodes to seventeen and decreased the total purchase price to $680,997.

## B.     The Performance Bond

Soon after the initial purchase order, Allegheny Casualty Company issued a bond for $704,382, guaranteeing Fiber-Span's performance (the "Bond"). It was never changed to reflect the amended and lower price. The Bond included a two-year limitations period, requiring that "[a]ny suit … be

---

of dust or liquids." *IP Ratings*, Int'l Electrotechnical Comm'n, https://www.iec.ch/ip-ratings (last visited Jan. 5, 2022). "IP66" is rated as "Dust tight" and "Protected against powerful water jets[.]" *Id.*

instituted [by Transit] before the expiration of two (2) years from the date on which final payment under the [Purchase Agreement] falls due." (J.A. at 162.)

### C. The Initial Build

Payment for the Initial Build under the Purchase Agreement was based on the passing of seven milestones: (1) "10% of Purchase Order value with order"; (2) "10% of Purchase Order value on delivery of critical components to [Fiber-Span for use in making the Nodes]"; (3) "10% of Purchase Order value on [Fiber-Span] carrying out successful pre-testing"; (4) "5% of Purchase Order value on passing FCC tests"; (5) "5% of Purchase Order value on passing interoperability testing"; (6) "40% of Purchase Order value on delivery … after successfully passing all required tests"; and (7) "20% of Purchase Order value on successful commissioning and [Nodes] ready for commercial service or 3 months after delivery of [Nodes] to [Transit,] whichever is the earlier." (J.A. at 16, 58, 398.) With the exception of Milestone 7, all payments were to be made "on or about the 45th day from the day of receipt of a Correct Invoice[.]" (J.A. at 399.)

Milestones 1 and 2 were satisfied without difficulty, but when testing of the Nodes for Milestone 3 was underway, Transit raised an issue regarding the Nodes' excessive heat output and resulting high surface temperatures.[3] It sent a letter

---

[3] An external surface temperature requirement was not explicitly included in the Purchase Agreement but was incorporated by reference under the License. Specifically, the touch temperature of the Nodes was capped to "prevent burn

to Fiber-Span on February 28, 2011, stating that "protection would need to be incorporated" if the Nodes' external surface temperature exceeded 60°C. (J.A. at 72, 744.) Fiber-Span responded that it was "in [the] process of incorporating [an] engineering improvement" to address the surface temperature issue, and that it would "retrospectively deploy this solution to the 17 [Nodes] being delivered." (J.A. at 64, 749.) In the interim, however, Fiber-Span planned to retrofit the Nodes with fans for cooling and shields to protect the fans from environmental contaminants such as dust or liquids.

Despite Transit's concerns, Fiber-Span passed the pre-tests required at Milestone 3. Fiber-Span subsequently issued an invoice, which Transit timely paid in full. At Milestone 4, the Nodes passed the required FCC tests, and Fiber-Span issued another invoice. About a week later, however, Transit "cautioned that the [Nodes], with proposed retrofit [i.e., the fans and shields], would not be accepted unless all testing and specifications were met." (J.A. at 72, 748-49.) Fiber-Span responded that same day that it would only "ship the goods … if acceptance occurred upon completion of the testing on the original goods, with testing on the retrofit to occur in the

---

injuries to the public." (J.A. at 64.) Other quality and technical requirements were also imposed by the License. Additionally, the License required the network to be passively cooled at 50°C, such that "fans and other moving parts [are] minimized" in the subway environment. (Dist. Ct. D.I. 15-9 at 22.) Fans could be used "in the event this temperature range was inadequate in any or all locations." (Dist. Ct. D.I. 15-9 at 22.) In the event of conflict between the standards set in the Purchase Agreement and those in the License, the more stringent standard applied.

future." (J.A. at 65 (citing J.A. at 748).) Without resolving that dispute, Transit tendered payment in full for Milestone 4.

Upon completion of Milestone 5, on April 14, 2011, Transit's CEO wrote in an email to representatives of Transit's parent company that Fiber-Span had passed the "critical interoperability testing at [Fiber-Span's] plant[,]" which was a "key step in the delivery process for the Fiber-Span equipment[.]" (J.A. at 751.) He noted that Fiber-Span had also completed "successful FCC, safety[,] and environmental testing … allow[ing] [Transit] to progress with installation of … the Initial Build stations starting next week." (J.A. at 18, 751.) The critical interoperability test was witnessed by "key NYCT[A]/MTA staff" who "appeared very satisfied and impressed with the signal quality through the Fiber-Span equipment." (J.A. at 751.)

Three days after that upbeat assessment, however, Transit's Chief Technology Officer sent an internal email to other Transit employees mentioning a problem with the Nodes' power consumption and "resultant heat" limits. (J.A. at 63, 333.) That is, the Nodes were drawing close to 500 watts of power, which exceeded the Purchase Agreement's maximum power limit of 395 watts. As noted earlier, Transit had already raised concerns regarding the external surface, or "touch," temperature of the Nodes, an issue that was linked to the excessive power draw. Nevertheless, the CTO "conditionally" signed off on the completion of the testing.[4] (J.A. at 63, 333.) Transit tendered payment in full for Milestone 5.

---

[4] As the Bankruptcy Court observed, "[t]here is no provision in the [Purchase] Agreement for 'conditional'

10

The next day, in satisfaction of Milestone 6, Fiber-Span delivered the Nodes and related equipment to Transit's third-party contractor for installation. Nine days later, Transit's CEO sent an email stating that "[Transit] successfully completed Factory Acceptance Testing and Interoperability testing of the Fiber-Span equipment earlier this month[,] [t]hird party certification was provided … [, and] [t]he equipment … also pass[ed] FCC, environmental[,] and [Underwriters Laboratories] testing at independent labs." (J.A. at 62, 753.)

Once again, though, the sense of satisfaction quickly passed. On May 13, 2011, Transit sent Fiber-Span a letter, complaining that "[t]here are a number of items that will need to be resolved or clarified regarding the recent … delivery[.]" (J.A. at 467.) Transit raised an issue with the "high temperature" of the Nodes and explained that "it is unlikely that [the retrofitting with fans] will be accepted, as the MTA/NYCT[A] specification calls for passive cooling." (J.A. at 467.) It also claimed that Fiber-Span had either not carried out or failed to provide results for "a significant amount of the testing specified in [the] Purchase Agreement" and the License. (J.A. at 467.) Transit followed up three days later, emphasizing that "[t]he excessive heat output is of serious concern[.]" (J.A. at 479.)

In response, Fiber-Span drew a distinction between "pilot" Nodes and "production" Nodes: the pilot Nodes apparently being those included in the Initial Build, and the production Nodes those to be included in the Full Build. It

approval of testing." (J.A. at 63.)

11

proposed to eventually "integrate higher efficiency [radio frequency] amplifiers … and additional thermal engineering advances into the production [Nodes]." (J.A. at 482.) According to Fiber-Span, the increased efficiency would have the effect of "reducing the total [Node] power below 395 Watts." (J.A. at 482.) It said that the final production Nodes would be "passively cooled[,]" but, in the meantime, that it would retrofit the pilot Nodes. (J.A. at 482.) It also promised to later upgrade the pilot Nodes with the "production passively cooled solution … at no cost." (J.A. at 482.) And it subsequently noted that "it was only covering costs for the retrofit as an accommodation to Transit, [because] its position [was] that there was no specification for surface temperature." (J.A. at 73, 759.)

Seemingly ignoring Fiber-Span's message that passive cooling would have to wait, Transit responded a few days later that it "appreciated and accepted" Fiber-Span's "offer to retrofit the Initial Build [Nodes] with the passively cooled solution without cost to Transit[.]" (J.A. at 485.) It also noted that it "ha[d] not approved any solution [because] [a]pproval can only be given when a solution is demonstrated to be safe and fully meet specification." (J.A. at 487.) Transit nevertheless paid Fiber-Span's Milestone 6 invoice in full.

Fiber-Span issued the Milestone 7 invoice on June 1, 2011, and soon after, the parties met and discussed, among other things, issues surrounding the Nodes' external temperature, the delivery of production Nodes, and additional testing. According to minutes kept by Transit, Fiber-Span stated that the retrofitted Nodes were an "interim" solution and that a "permanent solution without fans continues to be developed." (J.A. at 488.) Those minutes also reported that

12

Fiber-Span would begin retrofitting the Initial Build Nodes with fans and shields on June 21, 2011; it would target November 1, 2011 to complete the permanent solution; and it would upgrade those Nodes "without charge." (J.A. at 488.) That did not stop Transit from noting its dissatisfaction. On July 7, 2011, it informed Fiber-Span that it considered the Nodes to be "outside the contractual specification[,]" citing its excessive power and external heat concerns.[5] (J.A. at 490.) Transit stated that until the permanent solution was executed, tested, and certified, it would be "unable to consider the [Nodes] as accepted." (J.A. at 490.)

Payment on Fiber-Span's invoice for Milestone 7 was due July 18, 2011. Instead of paying the invoice in full, Transit issued a check for half of the invoice and included two handwritten notes. The first stated that Transit was only paying half of the final invoice, and the second note explained that the

---

[5] That position was somewhat at odds with Transit's internal view about a month earlier. On June 6, 2011, Transit asked Underwriters Laboratories whether "there [is] a standard for the temperature of operating equipment for safety in a public environment; e.g., what is the maximum allowable temperature a device can operate at without harming someone that may come in contact with the device?" (J.A. at 763.) Underwriters Laboratories provided a table of values and informed Transit that temperature limitations may vary due to engineering considerations. On June 8, 2011, in an internal email, Transit's CTO stated that "if this is correct it makes Fiber-Span compliant per [Underwriters Laboratories] for touch. But still not compliant for specified power draw[.]" (J.A. at 761.)

13

remainder would be "paid if agreed by [Transit's CEO] at later date or on delivery of fully compliant [Nodes.]" (J.A. at 66.) Transit submitted a final installment payment of $15,943.96 two years later, on July 18, 2013, after deducting $66,687.74 for what it identified as "Warranty Repair Costs."[6] (J.A. at 529.) In total, Transit paid $643,606 to Fiber-Span.[7]

### D.    The Network Launch

Leading up to the network launch of the Initial Build, Fiber-Span and Transit continued their inconclusive back and forth about a permanent solution for the already installed Nodes. Fiber-Span took the position that the "permanent solution [would] be developed in conjunction with the larger Full Build," while Transit believed "the permanent fix must be provided to the already-installed [Nodes] before the business relationship between the parties can continue." (J.A. at 77.) Although the parties' communications demonstrate a growing disconnect, Transit submitted a request to the MTA/NYCTA for approval of the network, stating that it had "satisfactor[il]y completed its construction of the Initial Build[.]" (J.A. at 813.)

---

[6] Transit appears to have calculated that deduction from two invoices it sent Fiber-Span: one on October 28, 2011, for $38,997.74 in repair costs, and one on January 7, 2013, for $27,690 in "additional service repairs." (Fiber-Span Op. Br. at 14; J.A. at 528-29, 589-92.) The final installment payment also included amounts due to Fiber-Span for supplemental invoices Fiber-Span submitted for $4,800 and $9,747.

[7] It is unclear from the record before us precisely how this sum was calculated, but the parties do not dispute its accuracy.

14

The MTA/NYCTA accepted the Initial Build, and the network launched a few days later, on September 27, 2011. On November 18, 2011, Transit asked Fiber-Span for a status update and schedule for the "production version" Nodes. Fiber-Span stated that a schedule would be developed "at the time of new order placement" with replacement of the pilot Nodes to begin "along with Full Build Deliveries." (J.A. at 78.)

In January 2012, the parties reached an impasse. Transit sent a letter insisting that Fiber-Span replace the Initial Build Nodes and provide a committed delivery date. For its part, Fiber-Span reiterated its offer to upgrade those Nodes "upon receipt of a Production order … for the next round of 30 stations[.]" (J.A. at 79.) Transit threatened Fiber-Span with a lawsuit for breach of contract, but neither party took direct action against the other until the middle of that year.

## E.    Breakdown of Commercial Relations

In mid-2012, Transit entered into a non-exclusive agreement with another supplier for the next thirty subway stations. It informed Fiber-Span of its decision during a July 17, 2012 call. In the call, Fiber-Span claimed that updates to the retrofitted Nodes were always contingent on it being awarded the Full Build, but Transit repeated that it would not commit to a Full Build until the Nodes conformed to the Purchase Agreement and passed the necessary testing. If it were not already abundantly clear to Transit, it was now beyond doubt that Fiber-Span would not replace the Initial Build Nodes without a contract for the Full Build.

15

Following that call, Fiber-Span continued to repair the Nodes, provide service, and sell spare parts to Transit, as was required under the Purchase Agreement. Fiber-Span also continued to meet with Transit to discuss its role as a potential supplier for the Full Build. On or about September 28, 2012, however, it issued an invoice to Transit for the $450,000 IBC, perhaps as an acknowledgement that it was not selected for the Full Build. Transit, in response, refused to pay the IBC because the Nodes did not meet the Purchase Agreement's specifications.

The parties failed to achieve a resolution so, by July 23, 2013, Fiber-Span stopped servicing, repairing, or selling spare parts to Transit. Fiber-Span also ceased all communications with Transit. On September 4, 2013, Transit sent Fiber-Span a formal notice declaring Fiber-Span in breach of the Purchase Agreement. Two days later, Transit sent Fiber-Span's surety provider, Allegheny, notice that it was demanding payment on the Bond. That was its first attempt to contact Allegheny "in the 29-month period between delivery and declaration of default[.]" (J.A. at 45.) Allegheny refused to pay. And, despite sending those notices, Transit continued utilizing the Nodes through May 2014 – more than three years after delivery.

**F.     The Lawsuit**

Transit sued Fiber-Span and Allegheny in New York Supreme Court in March 2015. Its complaint asserted breach of contract and four other state-law claims against Fiber-Span, and a claim for breach of the Bond obligations against Allegheny. In September 2016, however, Fiber-Span filed a Chapter 7 bankruptcy petition in the U.S. Bankruptcy Court for the District of New Jersey. The next day, the Bankruptcy Court

16

appointed a Chapter 7 trustee for the Fiber-Span estate.[8] Shortly thereafter, Allegheny removed Transit's lawsuit to the Southern District of New York and requested that the case be transferred to the District of New Jersey. Despite Transit's efforts to remand the case back to state court, the New York federal court granted Allegheny's motion to transfer venue to the New Jersey District Court, which, in turn, referred the case to the Bankruptcy Court.

The Bankruptcy Court held a three-day bench trial in November 2018. At the trial's conclusion, the Bankruptcy Court held that Transit had accepted the Nodes through its continued retention and use of them. Still, it found that Fiber-Span had breached the Purchase Agreement's "Warranty, [and] Repair and Support" Provisions and was thus responsible for $1,283,606 in damages, being the total amount paid, $643,606, plus $640,000 in costs that Transit incurred when installing the Initial Build.[9] And, because Fiber-Span was in breach, the Bankruptcy Court held that it was also not entitled to the $450,000 IBC payment. Finally, it ruled that Allegheny was not liable to Transit on the Bond, given the expiration of the Bond's two-year limitations period.

---

[8] Although Fiber-Span's estate is administered by the Chapter 7 trustee, we refer to the Appellant as Fiber-Span for simplicity.

[9] Because Transit only submitted evidence of damages arising under the Warranty Provision, the Bankruptcy Court limited damages to that provision.

Transit and Fiber-Span both timely appealed to the District Court. Transit contended that Allegheny was liable on the Bond, while Fiber-Span argued that it was not liable for $1,283,606 in damages and was entitled to the $450,000 IBC.

The District Court affirmed the Bankruptcy Court's decision in part and reversed in part. It agreed that Fiber-Span breached the Purchase Agreement by supplying non-conforming Nodes but, contrary to the Bankruptcy Court, determined that Transit had rejected those Nodes, entitling Transit to $643,606 in rejection damages (i.e., the amount paid). The District Court's award excluded the $640,000 in installation costs, which it treated as non-recoverable incidental damages. Because it agreed with the Bankruptcy Court's finding of breach, it also agreed that Fiber-Span was not entitled to the IBC payment. Finally, it held that recovery on the Bond was not time-barred, and it ordered remand with instructions to enter judgment against Allegheny.

Fiber-Span and Allegheny both appealed from the District Court's order, and Transit cross-appealed.

## II. DISCUSSION[10]

Because the parties agreed to resolve their disputes under New York law, we apply Article 2 of the New York

---

[10] The Bankruptcy Court had jurisdiction under 28 U.S.C. § 157(b). The District Court had jurisdiction to review the appeal under 28 U.S.C. § 158(a), and we have jurisdiction to review the District Court's final decision pursuant to 28 U.S.C. § 158(d)(1). In doing so, we "stand in the shoes of the

18

Uniform Commercial Code ("N.Y. U.C.C."). *See Sears, Roebuck & Co. v. Galloway*, 600 N.Y.S.2d 773, 775 (App. Div. 1993) (holding that agreements for the "sale and delivery of goods" are governed by U.C.C. Article 2). Turning first to the question of acceptance, we conclude that Transit indeed accepted the non-conforming Nodes and did not revoke that acceptance. Any other outcome would be inconsistent with Transit's years of use and profit. Next, because the Nodes did not conform to the Purchase Agreement, Transit does not owe Fiber-Span the IBC sum, even though Transit selected a different supplier for the Full Build. Moreover, Transit is entitled to damages for breach of the Warranty Provision, but for something less than either the Bankruptcy Court or the District Court awarded. Finally, Allegheny has no responsibility under the Bond because Transit's suit is time-barred.

### A. The Non-Conforming Nodes Were Accepted by Transit

Fiber-Span argues that Transit accepted the non-conforming Nodes and therefore was not entitled to rejection damages. We agree. Transit accepted the Nodes three months after delivery, at Milestone 7, and did not revoke its acceptance at any point after that.

---

District Court and … review the Bankruptcy Court's legal conclusions de novo and its factual findings for clear error." *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 209 (3d Cir. 2011) (en banc) (citation and internal quotation marks omitted).

19

The Bankruptcy Court seemed to suggest that the Nodes were rejected and then accepted, but it also wrote that the Nodes existed in a "limbo-like state between rejection and acceptance[.]" (J.A. at 44.) The District Court understood the Bankruptcy Court to be finding the Nodes were rejected, and the District Court then supported that interpretation with independent factfinding. But, as detailed later, the District Court was exercising appellate review over the Bankruptcy Court's finding of fact and so was obligated to accept those findings unless they were clearly erroneous. *In re Old Summit Mfg., LLC*, 523 F.3d 134, 137 (3d Cir. 2008). That is our role as well. *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 209 (3d Cir. 2011) (en banc). And because the best reading of the Bankruptcy Court's decision is that it found the Nodes were ultimately accepted, we will reinstate that finding, with the caveat that such acceptance occurred on July 18, 2011, three months after delivery of the Nodes.

Under New York law, whether there has been acceptance or rejection of goods that do not conform to the contract's requirements are questions of fact. *See, e.g.*, *Sherkate Sahami Khass Rapol v. Henry R. Jahn & Son, Inc.*, 701 F.2d 1049, 1051-52 (2d Cir. 1983) (applying New York law); *ICS/Executone Telecom, Inc. v. Performance Parts Warehouse, Inc.*, 569 N.Y.S.2d 42, 43 (App. Div. 1991) (treating acceptance and rejection as questions of fact). A buyer accepts goods if, after a reasonable opportunity to inspect them, he "signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity[.]" N.Y. U.C.C. § 2-606(1)(a). Goods are also accepted if the buyer fails to make an effective rejection or "does any act inconsistent with the seller's ownership[,]" *id.* § 2-606(1)(b)-(c), including making "continued use of the

20

goods[,]" *Hooper Handling, Inc. v. Jonmark Corp.*, 701 N.Y.S.2d 577, 578 (App. Div. 1999); *accord V. Zappala & Co. v. Pyramid Co. of Glens Falls*, 439 N.Y.S.2d 765, 767 (App. Div. 1981) ("[B]y using the nonconforming blocks in the walls of its shopping mall, Pyramid accepted them[.]").

To make an effective rejection, the buyer must reject the goods "within a reasonable time after their delivery" and "seasonably notif[y] the seller." N.Y. U.C.C. § 2-602(1). To do so, the buyer must "unequivocally communicate his intent to the seller." *Ask Techs., Inc. v. Cablescope, Inc.*, 2003 WL 22400201, at *3 (S.D.N.Y. Oct. 20, 2003) (citing *Sears, Roebuck & Co.*, 600 N.Y.S.2d at 775). A buyer's "repeated complaints and requests for service" are insufficient to reject (or revoke acceptance), though they may be "sufficient to preserve [the buyer's] right to sue for damages[.]" *Cliffstar Corp. v. Elmar Indus., Inc.*, 678 N.Y.S.2d 222, 223 (App. Div. 1998); *see also Sears, Roebuck & Co.*, 600 N.Y.S.2d at 775 ("[M]ere complaint about the goods does not constitute a clear and unequivocal act of rejection[.]" (citation and internal quotation marks omitted)).

After a buyer accepts non-conforming goods, it may still revoke acceptance if the goods' non-conformity "substantially impairs [their] value[.]" N.Y. U.C.C. § 2-608(1). Such revocation is possible if the goods were accepted "on the reasonable assumption that [the goods'] non-conformity would be cured" but such cure does not "seasonably" occur. *Id.* § 2-608(1)(a). Even so, revocation must occur "within a reasonable time after the buyer discovers or should have discovered" the non-conformity and "before any substantial change in condition of the goods which is not caused by their own defects." *Id.* § 2-608(2). "Revocation of acceptance is

21

untimely and unreasonable when a buyer continues to use goods purchased from a seller and treats them in a manner inconsistent with revocation after it becomes clear that the deficiencies in the goods cannot be cured to the buyer's satisfaction." *Maciel v. BMW of N. Am., LLC*, 2021 WL 983013, at \*11 (E.D.N.Y. Feb. 22, 2021) (citation and internal quotation marks omitted).  If acceptance is properly revoked, the buyer has the same rights and responsibilities as if he had rejected the goods.  N.Y. U.C.C. § 2-608(3).

The Bankruptcy Court found that Transit knew of the Nodes' non-conformity at the time of delivery, and that any post-installment discovery of additional non-conformities "occurred within three months of delivery[,]" when final payment became due under Milestone 7.  (J.A. at 90.)  Transit nevertheless accepted the Nodes "at latest [on] July 23, 2012," because by that point, the Bankruptcy Court said, Transit knew that Fiber-Span was no longer seeking an opportunity to cure. (J.A. at 92.)  In coming to that conclusion, the Court relied on N.Y. U.C.C. § 2-508 which affords a seller the opportunity to cure non-conforming goods if the buyer rejects them.  Because the Nodes were not rejected, however, that statute is inapplicable.

On appeal, the District Court interpreted the Bankruptcy Court as holding that the Nodes were rejected within a reasonable time after their delivery.  It then made its own finding that the Nodes were not later accepted, because "Transit's use of the rejected [Nodes] after July 23, 2012 was reasonable." (J.A. at 32.)  It thus awarded Transit $643,606 in rejection damages – the full amount Transit paid.  The District Court did, however, exclude installation costs incurred by Transit during the Initial Build.  It held that the installation

22

costs were incidental pursuant to N.Y. U.C.C. § 2-715(1) and, under the Purchase Agreement, were not recoverable.

Fiber-Span argues that the District Court misinterpreted the Bankruptcy Court as finding that Transit rejected – and did not later accept – the Nodes. And, says Fiber-Span, to the extent the Bankruptcy Court did find the Nodes were rejected, that was clearly erroneous because Transit was aware of the Nodes' non-conformity and still possessed, controlled, and profited from them for nearly three years. Transit, on the other hand, contends that its post-rejection use was entirely reasonable because removing the Nodes would have jeopardized its business and "shut[] down the [n]etwork in the Initial Build stations for an extended period of time[.]" (Transit Answer. Br. at 37.) It further asserts that, even if it did accept the Nodes, it revoked that acceptance when Fiber-Span did not cure the non-conformity.

We begin with a reminder: When sitting in an appellate capacity, district courts are obligated to accept a bankruptcy court's factual findings unless those findings are clearly erroneous. *See In re Phila. Newspapers, LLC*, 599 F.3d 298, 303 (3d Cir. 2010). Findings of fact are not clearly erroneous unless they are "completely devoid of minimum evidentiary support displaying some hue of credibility or bear[] no rational relationship to the supportive evidentiary data." *Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 353 (3d Cir. 2002) (quoting *Hoots v. Pennsylvania*, 703 F.2d 722, 725 (3d Cir. 1983)). In this complex case, the Bankruptcy Court and District Court both did admirable work in seeking to understand the facts. Great care must be exercised, however, to defer to the fact-finding tribunal, absent clear error, and here the role of fact-finder belonged to the Bankruptcy Court.

The best interpretation of the Bankruptcy Court's factfinding is that the Nodes were accepted. Upon delivery and inspection of the non-conforming Nodes, Transit had three options: (i) reject them (N.Y. U.C.C. §§ 2-601 to -602) and allow Fiber-Span to cure (*id.* § 2-508); (ii) accept them and later revoke acceptance if Fiber-Span failed to cure (*id.* §§ 2-608, -711); or (iii) accept them and seek damages for breach (*id.* §§ 2-607, -714). *Cliffstar Corp.*, 678 N.Y.S.2d at 222-23. The District Court interpreted the Bankruptcy Court as finding that Transit pursued the first option, based on its citation to N.Y. U.C.C. § 2-508, but the record is inconsistent with that view. The Bankruptcy Court said, "[b]ecause Transit had knowledge that Fiber-Span was no longer seeking to cure … [i]ts failure to effectively reject after that point, along with its continued possession and use of the goods in a manner inconsistent with Fiber-Span's ownership, constitute acceptance of the goods." (J.A. at 92.) In short, Transit accepted the Nodes three months after delivery, giving it revocation rights if Fiber-Span did not cure the non-conformity. But because Transit failed to revoke acceptance even after it became clear that Fiber-Span would not cure, it lost the ability to do so and was left to seek damages for breaches of warranty and contract.

The record amply supports the Bankruptcy Court's finding of acceptance. Transit received delivery of the Nodes knowing that they did not conform with the Purchase Agreement's specifications. And although it repeatedly asked Fiber-Span to replace the non-conforming Nodes, it acted inconsistently with Fiber-Span's ownership by installing the Nodes, paying for a portion of the final invoice under Milestone 7 three months later, and continuing to use the Nodes for close to three years thereafter. *See Seabury Constr.*

24

*Corp. v. Jeffrey Chain Corp.*, 2000 WL 1170109, at *2 (S.D.N.Y. Aug. 17, 2000) ("Goods that a buyer has in its possession necessarily are accepted or rejected by the time a 'reasonable opportunity' for inspecting them passes." (quoting N.Y. U.C.C. § 2-606(1))). That acceptance is further evidenced by Transit's taking the network live after telling its licensor, the MTA/NYCTA, that it had "satisfactor[il]y completed its construction of the Initial Build[.]" (J.A. at 813.)

Regarding the timing of that acceptance, Transit must first have been afforded a "reasonable opportunity to inspect the" Nodes for any non-conformities. N.Y. U.C.C. § 2-606. The Bankruptcy Court did not err in finding that the date when that period expired is July 18, 2011, because, "[t]o the extent that Transit learned of additional non-conformities after installation of the goods, that knowledge occurred within three months of delivery[,]" when payment on the final milestone fell due. (J.A. at 90.) The "degree of inspection" is a factual question that we will not reconsider absent clear error, *Telit Wireless Sols., Inc. v. Axesstel, Inc.*, 2016 WL 1587246, at *7 (S.D.N.Y. Apr. 18, 2016), and here we have no reason to question the Bankruptcy Court's conclusion.

We recognize, of course, that under N.Y. U.C.C. § 2-608, Transit could still have revoked its acceptance if Fiber-Span failed to seasonably cure. But Transit never did so. It continued using and benefiting from the Nodes long after it became clear that Fiber-Span would not replace or adequately repair them. Transit's conduct is thus inconsistent with revocation. In *Computerized Radiological Services v. Syntex Corp.*, 786 F.2d 72, 75 (2d Cir. 1986), for instance, the Second Circuit, applying the California U.C.C., determined that the buyer's "continued … use [of] the [good] for some 22 months

25

after the letter of revocation" was "inconsistent with the seller's ownership [of that good] and may be found to constitute an acceptance." It held the buyer's use to be far longer than reasonably necessary to find a replacement. *Id.* Similarly, the Second Circuit has applied the N.Y. U.C.C. to hold that a buyer could not revoke acceptance when it "exercised control over [certain machines] for more than three years, obtained benefits from their use, and never even asked [the defendant-seller] to take them back." *Sobiech v. Int'l Staple & Mach. Co.*, 867 F.2d 778, 781 (2d Cir. 1989). Those cases describe Transit's conduct precisely.

In sum, Transit accepted the non-conforming goods and did not revoke that acceptance. It must therefore rely on its evidence of damages for breach of the Warranty Provision to obtain relief. That is the subject to which we turn next.

## B. Fiber-Span Breached the Purchase Agreement, Entitling Transit to Damages.

Fiber-Span argues that the Nodes "fully conformed" with the specifications in the Purchase Agreement (Fiber-Span Op. Br. at 47), but, it says, if breach is found, Transit should be limited to damages under the Agreement's Warranty Provision. The argument is half right. The Bankruptcy Court did not clearly err in finding that Fiber-Span breached the Purchase Agreement by failing to deliver conforming goods. With respect to damages, however, we agree with Fiber-Span that Transit's damages are controlled by the Warranty Provision and must be recalculated to reflect the difference in value between the Nodes as promised and the Nodes as delivered. Contrary to the Bankruptcy Court's award, that sum excludes initial installation costs.

26

## 1. *Breach of Contract*

Breach of contract, like acceptance and rejection, is a question of fact. *United States ex rel. N. Maltese & Sons, Inc. v. Juno Constr. Corp.*, 759 F.2d 253, 255 (2d Cir. 1985) (applying New York law). When a buyer accepts non-conforming goods, that acceptance does not prevent it from recovering damages for a breach. *See* N.Y. U.C.C. §§ 2-607(2), 2-714(1). The calculation of those damages is also a question of fact. *Vt. Microsystems, Inc. v. Autodesk, Inc.*, 138 F.3d 449, 452 (2d Cir. 1998). Whether the right formula was used for that calculation, however, is a question of law. *Id.* For a buyer to preserve its right to damages, it must notify the seller of any breach within a reasonable time after discovery. N.Y. U.C.C. § 2-607(3).

The Bankruptcy Court determined the Nodes to be non-conforming because of their excessive power consumption and, consequently, their heightened external surface temperature. It also found that Fiber-Span's retrofitting efforts brought the Nodes further out of compliance by violating the Purchase Agreement's IP66 ingress rating, which required the Nodes be impervious to "dust" and "powerful water jets." (J.A. at 75-76.) And although Transit continued making payments under the Milestones, the Bankruptcy Court concluded that its doing so "did not waive any rights to a compliant product," since those payments were "a business decision to move the process along, with the belief that the issue would be resolved." (J.A. at 71.) Thus, the Bankruptcy Court found Fiber-Span in breach of the Warranty Provision. It also found that Fiber-Span breached the Repair and Support Provisions because it stopped

27

servicing, repairing, or selling spare parts to Transit after July 2013.

Based on its findings of breach, the Bankruptcy Court awarded Transit $1,283,606 in restitution damages, which included the amount paid on the contract as well as the $640,000 in installation costs paid by Transit to a third party to install the Initial Build. Although the District Court agreed with the Bankruptcy Court's findings of noncompliance and breach, it excluded the installation costs as "incidental" under N.Y. U.C.C. § 2-715(1), in accordance with the Purchase Agreement.[11]

Fiber-Span now argues that Transit waived its ability to object to the Nodes as non-conforming because it did not challenge the maximum power specification at testing and, therefore, may not assert breach. The Nodes consumed close to 500 watts, well above the specifications' maximum power

---

[11] N.Y. U.C.C. § 2-715 defines incidental damages as those "resulting from the seller's breach includ[ing] expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." Fiber-Span and Transit agreed that neither party would be responsible for the other's incidental damages. They also agreed that, for roughly two years, Fiber-Span would be responsible for any "de-installation and re-installation charges" associated with the removal and replacement of non-conforming equipment. (J.A. at 57, 406.)

limit of 395 watts. That fact is undisputed. The issue of waiver turns on whether Transit "evince[d] an intent not to claim" the benefit of the lower power consumption requirement. *Gen. Motors Acceptance Corp. v Clifton-Fine Cent. Sch. Dist.*, 647 N.E.2d 1329, 1331 (N.Y. 1995). The record on this point is not entirely clear, as Transit took inconsistent positions about whether the Nodes were satisfactory or whether it was concerned about the excessive power consumption and overheating.[12] Nevertheless, the Bankruptcy Court did not

---

[12] *Compare* J.A. at 490 (Transit informing Fiber-Span that it considered that it considered the Nodes to be "outside the contractual specification[,]" citing power consumption and external heat concerns), J.A. at 498 (Transit warning Fiber-Span that the Nodes presented "a clear case for breach of contract"), J.A. at 500 (Transit stating that it had "no confidence" that the Nodes were a "stable product"), J.A. at 502 (Transit requesting that Fiber-Span commit to when the delivered Nodes would be replaced and retested), *and* J.A. at 744 (Transit raising again the Nodes' surface temperature as an issue), *with* J.A. at 751 (Transit CEO emailing its parent company that the Nodes passed all "critical interoperability testing" which was a "key step in the delivery process"), J.A. at 751 (Transit CEO stating that the Nodes completed "successful FCC, safety[,] and environmental testing" allowing for installation), J.A. at 751 (Transit's CTO stating the testing of the Nodes was witnessed by the MTA/NYCTA, who "appeared very satisfied and impressed with the signal quality"), J.A. at 753 (Transit's CEO, again, confirming that Fiber-Span passed the necessary testing, including FCC and Underwriters Laboratories testing, and received thirty party certification), *and* J.A. at 813 (Transit submitting a request to

clearly err in finding that Transit did not intend to waive its right to the agreed-upon power consumption limit. *See Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006) ("Generally, the existence of an intent to forgo … a [contractual] right is a question of fact."). The Bankruptcy Court thoroughly considered all communications on the subject, and its finding is consistent with the record.

So too is the finding that the Nodes, once retrofitted, did not comply with the Purchase Agreement's ingress protection rating specification. Fiber-Span argues, however, that because Transit expressly permitted it to retrofit the Nodes with fans to address surface temperature issues, it also waived the issue. But the Bankruptcy Court did not clearly err in finding that "there was no approval of the retrofit as a permanent solution[.]" (J.A. at 72.) Transit repeatedly made requests for a permanent solution, indicating that it viewed the retrofit as a temporary solution. Again, "waiver 'should not be lightly presumed' and must be based on 'a clear manifestation of intent' to relinquish a contractual protection." *Fundamental Portfolio Advisors, Inc.*, 850 N.E.2d at 658 (quoting *Gilbert Frank Corp. v Fed. Ins. Co.*, 520 N.E.2d 512, 514 (N.Y. 1988)). There was here no such clearly manifested intent.

In short, the Bankruptcy Court did not err in in any meaningful way in finding that Fiber-Span violated the Warranty Provision and the Repair and Support Provision of

_____

the MTA/NYCTA for approval of the network, stating that it has "satisfactor[il]y completed its construction of the Initial Build").)

the Purchase Agreement by supplying non-conforming Nodes and eventually "refus[ing] to provide service, repair, or … spare parts" for them. (J.A. at 83.) Transit chose, however, to submit evidence of damages only with respect to the Warranty Provision. So, we agree with the Bankruptcy Court that a proper damages analysis is reserved to that provision.

### 2. *Damages for Breach*

Fiber-Span argues Transit's damages are measured by calculating the "difference … between the value of the goods accepted and the value they would have had if they had been [as] warranted." (Fiber-Span Op. Br. at 36 (quoting N.Y. U.C.C. § 2-714).) And, it says, because Transit's only evidence of damages are invoices totaling $66,687, an amount Transit had already deducted from its final invoice, no additional damages should be awarded. In response, Transit argues that the Bankruptcy Court rightly concluded that Fiber-Span breached the Purchase Agreement, and so damages of $1,283,606 were properly awarded for the full purchase price plus initial installation. We conclude that the Bankruptcy Court erred by calculating damages as the full purchase price of the Initial Build and its installation. Transit is only entitled to the difference in value as defined by N.Y. U.C.C. § 2-714.

Under the Warranty Provision, through which damages to Transit must flow, the first choice of relief is framed as follows: "Materials not meeting the warranties will be replaced, repaired and/or re-performed as applicable," by Fiber-Span. (J.A. at 406.) If that non-monetary path had been followed by Fiber-Span, the company may have been on the hook for de-installing and re-installing the repaired or replaced Nodes. But Fiber-Span did not choose that path, so we turn to

31

the backup relief contemplated by the Warranty Provision, which provides that, "[i]f [Fiber-Span] is unable to repair, replace, or re-perform, [Fiber-Span] shall refund all costs incurred by [Transit] associated with warranty." (J.A. at 406.) The operative language is "all costs incurred by [Transit] associated with warranty[,]" and the question is how to define those costs.

Certain cases recognize the availability of a full refund of the purchase price of goods under N.Y. U.C.C. § 2-719. In those instances, however, the contract at-issue explicitly provided for a refund of the purchase price. *See, e.g.*, *President Container Grp. II, LLC v. Systec Corp.*, 467 F. Supp. 3d 158, 168 (S.D.N.Y. 2020) ("The warranty provision provides that [the seller's] 'liability in connection with this transaction is expressly limited to the repair or replacement … or refund of purchase price.'"); *APS Tech., Inc. v. Brant Oilfield Mgmt. & Sales, Inc.*, 2015 WL 5707161, at *1 (S.D.N.Y. Sept. 29, 2015) ("The [purchase agreement] contained a one-year limited warranty …, disclaimed all other warranties, and limited [the seller's] remedies to repair, replacement or refund of the purchase price of the equipment."). That is not what the parties agreed to here. The Bankruptcy Court in effect read the phrase "refund of purchase price" into the Purchase Agreement.

In our view, the operative language is at least ambiguous. *See Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 173 (2d Cir. 2004) (contract terms are ambiguous if they "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in

32

the particular trade or business" (citation and internal quotation marks omitted)).  Consequently, it is permissible to look to the default damages provision set out in N.Y. U.C.C. § 2-714, which states that "[t]he measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted."  That conclusion is supported by the circumstances as they developed.  Transit accepted the goods (albeit under protest), proclaimed their satisfactory quality to the MTA/NYCTA, insisted on and received modifications to them, and then used them for several years before replacing them.  Interpreting the words "refund all costs incurred by [Transit] associated with warranty" to mean that Transit was free to use the goods, which proved serviceable for longer than the period of the warranty, and then pay nothing – because of a full refund – is at odds with the "overriding goal of UCC remedies[.]"  *United States for Use & Benefit Saunders Concrete Co., Inc. v. Tri-States Design Const. Co., Inc.*, 899 F. Supp. 916, 923 (N.D.N.Y. 1995) (citation omitted).  That goal is "to put the wronged party in as good a position as it would have been if the other party had fully performed."  *Id.*  The result Transit wants, by contrast, is to be put in a far better position than it would have been absent the breach.

Accordingly, the Bankruptcy Court should have calculated the difference in value between the non-conforming Nodes and the contracted-for Nodes, rather than awarding a full refund.[13]  The only evidence of such damages apparent to

---

[13] Although it is likely now apparent, we also hold that Transit is not entitled to the initial installation costs.  The

33

us from the appellate record is the $66,687 that Transit withheld after submitting a final installment on the Milestone 7 invoice. Still, on remand, Transit should have the opportunity to highlight for the Bankruptcy Court any other evidence of the difference in value, should such evidence exist in the trial record.

### C. Fiber-Span Is Not Entitled to the IBC.

Fiber-Span argues that payment of the IBC was not subject to conditions precedent and, even if it was, those conditions were "excused by the doctrines of waiver, estoppel

---

Warranty Provision does not contemplate the Bankruptcy Court's award of the $640,000 that Transit paid to install the Initial Build. Indeed, the record gives us every reason to believe that the parties bargained for Transit to bear the initial installation costs even if Fiber-Span breached the Warranty Provision. According to the Purchase Agreement, "[n]either party [would] be liable for any incidental, indirect, or consequential damages arising out of the breach of any provisions[.]" (J.A. at 419.) Instead, the parties merely contemplated that Fiber-Span would be responsible for deinstalling and reinstalling the Nodes, should it opt for a non-monetary remedy under the Warranty Provision. The District Court appropriately interpreted that limitation as preventing recovery of initial installation damages. *See AT&T Co. v. N.Y.C. Hum. Res. Admin.*, 833 F. Supp. 962, 983 (S.D.N.Y. 1993) ("The installation services that [the party] undertook as part of the contract were merely incidental to the sale of the [goods.]").

or disproportionate forfeiture."[14] (Fiber-Span Op. Br. at 41.) To the contrary, though, there were conditions precedent, and Fiber-Span failed to satisfy them, a failure not excused under any of the aforementioned doctrines.

The Purchase Agreement contemplated the payment of the $450,000 IBC to Fiber-Span, should it not be selected for the Full Build. The intent was for Fiber-Span to "recoup a portion of the [research, development, and engineering] costs it incurred based on its expectation of supplying the entire [n]etwork." (J.A. at 54.) The IBC, however, was made "contingent upon the occurrence of all the following conditions": (1) that the Nodes "meet all obligations in this [Purchase] Agreement, including, but not limited to, the Specifications," (2) that the Nodes be accepted, and (3) that Fiber-Span not be in default. (J.A. at 397.)

Under New York law, a condition precedent is defined as "an act or event, other than a passage of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415 (N.Y. 1995). When drafting, "[p]arties often use language such as 'if,' 'on condition that,' 'provided that,' 'in the event that,' and 'subject to' to make an event a condition[.]" *Ginett v. Computer Task*

---

[14] Fiber-Span also argues that, assuming the IBC was subject to conditions precedent, those conditions were fully satisfied because the equipment "fully conformed" with the Purchase Agreement's specifications. (Fiber-Span Op. Br. at 47.) We have already rejected that contention and need not address it further.

*Grp., Inc.*, 962 F.2d 1085, 1100 (2d Cir. 1992). Recognition of a condition precedent is disfavored if the contract language is ambiguous. *Ashkenazi v. Kent S. Assocs., LLC*, 857 N.Y.S.2d 693 (App. Div. 2008).

The Bankruptcy Court concluded that the three requirements were indeed conditions precedent to the IBC because they "were not disjunctive" and "were required to trigger [Transit's IBC] liability under the [Purchase] Agreement." (J.A. at 84.) It therefore held that the Nodes' non-conformity "alone preclude[d] any liability from Transit to Fiber-Span" under the IBC. (J.A. at 84.) It also rejected Fiber-Span's contention that Transit waived its objections to paying the IBC or was the beneficiary of a disproportionate forfeiture. The District Court agreed, and so do we.

Fiber-Span argues that the condition requiring it to "meet all obligations in this Agreement" (J.A. at 397) is ambiguous. Not so: Fiber-Span had to comply with every specification of the Purchase Agreement or it would not be entitled to the IBC. (*See* J.A. at 397 ("Any such liability from Company to Supplier is contingent upon occurrence of all the following conditions[.]").) But, says Fiber-Span, certain specifications in the Purchase Agreement differ from those in the License. The Bankruptcy Court acknowledged that and rightly concluded that the Purchase Agreement still makes clear that, in the event of such divergence, the stricter requirement controls.

In a last-ditch effort to avoid the consequences of its own default, Fiber-Span calls upon a handful of doctrines – waiver, estoppel, breach, and forfeiture – to excuse the conditions precedent. Despite the various labels, the argument

36

boils down to two points: Transit waived the conditions precedent by accepting the goods, and enforcement thereof would disproportionately affect Fiber-Span. Neither point is persuasive. First, acceptance of non-conforming goods does not amount to a waiver of a condition requiring the seller to comply with contract specifications. *See Fundamental Portfolio Advisors, Inc.*, 850 N.E.2d at 658 (contractual rights are waived when "they are knowingly, voluntarily and intentionally abandoned"). Second, enforcing the conditions precedent does not result in a forfeiture at all, let alone a disproportionate one. Forfeiture is "the denial of compensation that results when the obligee loses [its] right to the agreed exchange after [it] has relied substantially, as by preparation or performance[,] on the expectation of that exchange[.]" *Oppenheimer*, 660 N.E.2d at 419 n.2. Here, the parties explicitly contemplated Fiber-Span's financial risk and provided that the IBC would only mitigate such risk if Fiber-Span satisfied certain conditions. It did not do so, and that is an end to the matter.

### D. Transit's Suit Against Allegheny Casualty Is Time-Barred

Allegheny argues that it is not liable on the Bond because Transit's lawsuit against it was time-barred. That's how we see it as well. Final payment fell due on July 18, 2011, commencing the two-year limitations period under the Bond, and Transit did not bring suit until March 31, 2015.

Allegheny, as surety provider, executed the Bond on behalf of Fiber-Span and in favor of Transit for $704,382 – the amount of the original Purchase Order. Typically, under New York's statute of limitations, actions on a contract accrue on

37

and are to be commenced within six years of the date of breach. N.Y. C.P.L.R. § 213. Here, however, the parties negotiated a shorter time period, providing that "[a]ny suit under this bond must be instituted before the expiration of two (2) years from the date on which final payment under the Contract falls due." (J.A. at 462.) They were free to do that. *See Sidik v. Royal Sovereign Int'l Inc.*, 348 F. Supp. 3d 206, 213 (E.D.N.Y. 2018) ("Under New York State law, parties to a contract may agree to shorten the applicable statutory limitations period."). Under Milestone 7, final payment was due upon "successful commissioning and [having the Nodes] ready for commercial service or 3 months after delivery of [the Nodes] to [Transit,] whichever is the earlier." (J.A. at 398.) Delivery occurred on April 18, 2011, and three months from then was July 18, 2011. Commissioning, i.e., when the network went live, occurred later, on September 27, 2011, so the limitations period started accruing on July 18, 2011.

The Bankruptcy Court said that a "strict reading" of the Purchase Agreement would support a finding that final payment fell due on either July 18, 2011, or September 27, 2011. Nevertheless, it employed a "liberal interpretation of the [Purchase] Agreement, in an attempt to reach a reasonable and fair conclusion[,]" and it found that final payment became due on the date of Transit's acceptance of the Nodes, which it said was no later than July 23, 2012. (J.A. at 69.) Because Transit did not institute a suit until March 31, 2015, more than two years later, the Bankruptcy Court held that Transit's suit was time-barred.

The District Court, like the Bankruptcy Court, looked to the date of acceptance instead of delivery. It, however, decided that the suit was not time-barred because Transit rejected the

38

non-conforming Nodes, so final payment never fell due. Allegheny, of course, challenges that conclusion. It asserts that the "limitations period by its express, unambiguous terms[] was not conditioned upon anything other than Fiber-Span's delivery of the [Nodes] or the successful commissioning thereof" and that "unambiguous contracts [must] be read according to their ordinary meaning." (Allegheny Op. Br. at 28 (citing *White v. Cont'l Cas. Co.*, 878 N.E.2d 1019, 1021 (N.Y. 2007)).) That is correct.

As an initial matter, "acceptance" and "delivery" are independent concepts, and, pursuant to the Purchase Agreement, Transit's payment obligation arose upon delivery, not acceptance. Even if Transit had rejected the Nodes, "[t]ender of delivery is not defeated … by the buyer's refusal to accept the goods offered by the seller." *Rouse v. Elliot Stevens, Ltd.*, 2016 WL 8674688, at *3 (S.D.N.Y. June 24, 2016) (citing *Uchitel v. F.R. Tripler & Co.*, 434 N.Y.S.2d 77, 79 (App. Div. 1980)). And while the Purchase Agreement fails to define what is required for the Nodes to be deemed "delivered[,]" courts applying N.Y. U.C.C. § 2-503 have found that the tender of goods, regardless of their conformity, constitutes delivery and triggers the limitations period. *See, e.g.*, *Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 646 F. Supp. 1442, 1455 (S.D.N.Y. 1986) (finding that "even tender of *non*conforming goods is considered delivery" and holding that contractual four-year statute of limitations period began to run on the date of delivery); *Uchitel*, 434 N.Y.S.2d at 79 ("To argue that … accrual does not occur until a proper tender is made, would be to substitute in place of [the] four year limitation period a statute of non-limitation and allow the buyer a perpetuity in which to bring suit.").

Because delivery occurred on April 18, 2011, final payment fell due three months after that, on July 18, 2011, at which point the Bond's two-year limitations period began to run. Such an interpretation is consistent with a commonsense understanding of what Allegheny would have agreed to: a bond that lasts two years from a date certain, not two years from the uncertain moment when Transit might actually choose to accept the goods. The limitations period thus expired on July 18, 2013. Because Transit did not bring suit until March 31, 2015, its claim is time-barred.

## III.   CONCLUSION

For the forgoing reasons, we will vacate in part and affirm in part and remand to the District Court with instructions to, in turn, remand to the Bankruptcy Court for further proceedings consistent with this opinion.

40